794 F.2d 994
 MARGARET S., et al., Plaintiffs-Appellants Cross-Appellees,
v.
Edwin W. EDWARDS, Governor of the State of Louisiana, et
al., Defendants- Appellees Cross-Appellants.
MARGARET S., on her own behalf and on behalf of all other
similarly situated, et al., Plaintiffs-Appellees,
v.
Edwin W. EDWARDS, Governor of the State of Louisiana, et
al., Defendants- Appellants.
 Nos. 81-3750, 84-3520.
 United States Court of Appeals,
Fifth Circuit.
 July 18, 1986.
 
 Patricia N. Bowers, Asst. Atty. Gen., New Orleans, La., for plaintiffs-appellants cross-appellees.
 Suzanne M. Lynn, American Civil Liberties Union, Nan D. Hunter, Wendy E. Wells, Janet Benshoff, Diana Troub, New York City, Jane Johnson, New Orleans, La., for defendants-appellees cross-appellant.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before WILLIAMS, HIGGINBOTHAM, and DAVIS, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 We are asked to decide the constitutionality of two statutory provisions through which Louisiana has sought to regulate the practice of abortion. One provision requires that the attending physician inform his patient, within twenty-four hours after she undergoes an abortion, that she may exercise one of several options for the disposition of the fetal remains. The other forbids "experimentation" on the fetal remains of an abortion. We are persuaded that the first provision must be declared unconstitutional under City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 2502, 76 L.Ed.2d 687 (1983), and that the second is unconstitutionally vague.
 
 
 2
 * It is no secret that the Supreme Court's abortion jurisprudence has been subjected to exceptionally severe and sustained criticism. Quite apart from the highly visible political controversies revolving around the morality of abortion, the major judicial decisions in this area have been vigorously attacked--from within the Court[1] as well as by a broad range of distinguished constitutional scholars[2]--for the manner in which they interpret the Constitution. Because our duty is to apply the law as it has been stated by the Supreme Court and because the wisdom and coherence of the Court's doctrines have already been the subject of such thorough debate, we see no reason to offer our own evaluation of the Court's work. And because we think that this case is easily decided under current law, we have no occasion to address the difficulties that are often encountered when the answer to a close question has to be drawn from a problematic jurisprudence.[3]
 
 II
 
 3
 This appeal is the latest episode in a long effort by Louisiana to exercise its police power over a practice to which the courts have given considerable protection. Indeed, the state seeks "to regulate abortion to the extent permitted by the decisions of the United States Supreme Court." La.Rev.Stat.Ann. Sec. 40:1299.35.0 (West Supp.1986).[4] Although one would not think that there is anything inherently suspect about a state's undertaking to regulate in the abortion area,[5] Louisiana has repeatedly encountered constitutional objections to portions of its regulatory schemes. In 1978, a regulatory statute was enacted, but several of its provisions were struck down by the district court. Margaret S. v. Edwards, 488 F.Supp. 181 (E.D.La.1980). The Louisiana legislature promptly passed another statute, La.Rev.Stat.Ann. Secs. 40:1299.35.0-40:1299.35.18 (West Supp.1986), and the district court just as promptly enjoined the enforcement of certain of its provisions. After granting motions for partial summary judgment and holding a bench trial on most of the remaining provisions in 1981, the district court declared most of the statute's major provisions unconstitutional in 1984. Margaret S. v. Treen, 597 F.Supp. 636 (E.D.La.1984). Because of United States Supreme Court decisions handed down between the time of trial and the 1984 decision, the state has elected to defend only the two statutory provisions now before us.
 
 
 4
 This case has been prosecuted by certified classes of women and physicians. The state has not urged any serious standing issues, perhaps because the Supreme Court has visibly relaxed its traditional standing principles in deciding abortion cases. Compare Roe v. Wade, 410 U.S. 113, 123-29, 93 S.Ct. 705, 711-15, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 187-89, 93 S.Ct. 739, 745-46, 35 L.Ed.2d 201 (1973), with Roe v. Wade, 410 U.S. at 171-72, 93 S.Ct. at 736 (Rehnquist, J., dissenting), and Doe v. Bolton, 410 U.S. at 222-23, 93 S.Ct. at 763 (White, J., dissenting). Because we see no reason to suppose that the Supreme Court would find a standing problem with these plaintiff classes, we turn immediately to the merits of the case.
 
 III
 
 5
 La.Rev.Stat.Ann. Sec. 40:1299.35.14, together with its implementing regulations, requires the attending physician, within twenty-four hours after performing an abortion, to inform the woman that she can choose to have the fetus cremated, buried, or disposed of as waste tissue.[6] The state contends that because this information is to be provided to the woman only after the abortion, any burden on her constitutional rights is de minimis.
 
 
 6
 The district court decided that "[t]he woman's privacy right encompasses the entire process surrounding the abortion," 597 F.Supp. at 671; that the law in question "suggests to the woman that [the state] equates abortion with the taking of a human life ... [and] thus penalizes those women who do exercise their constitutional right in choosing abortion," id. at 670 (citations omitted); and that the law "intrudes into the doctor-patient relationship ... [and thus] unreasonably places 'obstacles in the path of the doctor upon whom [the woman is] entitled to rely for advice in connection with her decision,' "id. at 671 (quoting City of Akron, 103 S.Ct. at 2501 (quoting Whalen v. Roe, 429 U.S. 589, 604 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977))).
 
 
 7
 Because there are clearer and narrower grounds on which this statutory provision must be declared unconstitutional, we need not approve or disapprove the rationales relied on by the district court. Instead, we note that the City of Akron Court invalidated a law requiring that physicians personally disclose certain important information to women before performing an abortion: the Court held that "it is unreasonable for a State to insist that only a physician is competent to provide the information and counseling relevant to informed consent." 103 S.Ct. at 2503.[7] Because there is no question about the state's strong interest in ensuring that physicians obtain the patient's informed consent before performing abortions,[8] it follows a fortiori that Louisiana's statute--which insists that physicians personally disclose the less important information about disposition of fetal remains--is unconstitutional. In so holding, we do not decide whether a statute similar to Louisiana's, which allowed someone other than the attending physician to inform the patient about her options for the disposition of the fetal remains, would be constitutional.[9]
 
 IV
 
 8
 La.Rev.Stat.Ann. Sec. 40:1299.35.13 provides: "No person shall experiment on an unborn child or a child born as the result of an abortion, whether the unborn child or child is alive or dead, unless the experimentation is therapeutic to the unborn child or child."[10] La.Rev.Stat.Ann. Sec. 40:1299.35.18 imposes criminal penalties for violating this or any other section of the abortion statute.[11] The district court offered several alternative rationales for invalidating this provision. 597 F.Supp. at 673-76. Although we agree that this statutory provision is unconstitutional, we neither approve nor disapprove any of the rationales put forth by the district court. Our holding is based solely on our conclusion that the use of the terms "experiment" and "experimentation" makes the statute impermissibly vague.
 
 
 9
 A state's legislative enactment is void for vagueness under the due process clause of the fourteenth amendment if it "is inherently standardless, enforceable only on the exercise of an unlimited, and hence arbitrary, discretion vested in the state." Ferguson v. Estelle, 718 F.2d 730, 735 (5th Cir.1983). This test requires that the law be vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). The vagueness doctrine has been applied with considerable stringency to a law that required physicians to use professional diligence in caring for the life and health of a viable aborted fetus. Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).
 
 
 10
 The plaintiffs' expert witness offered unrebutted testimony, which we find quite plausible, that physicians do not and cannot distinguish clearly between medical experiments and medical tests. As the expert witness pointed out, every medical test that is now "standard" began as an "experiment" that became standard through a gradual process of observing the results, confirming the benefits, and often modifying the technique. Thus, as the witness concluded, "we have at one end things that are obviously standard tests and [at] the other end things that are complete experimentation. But in the center there is a very broad area where diagnostic procedures of testing types overlap with experimentation procedures...." Indeed, as the challenged statute itself seems to acknowledge, even medical treatment can be reasonably described as both a test and an experiment. This must be true whenever the results of the treatment are observed, recorded, and introduced into the data base that one or more physicians use in seeking better therapeutic methods. The whole distinction between experimentation and testing, or between research and practice, is therefore almost meaningless in the medical context. When one adds to this the fact that some innovative tests or treatments are done on fetal tissue in order to monitor the health of the mother,[12] one can see that physicians who treat pregnant women are being threatened with an inherently standardless prohibition. We therefore think that this statute "simply has no core" that unquestionably applies to certain activities, Smith v. Goguen, 415 U.S. 566, 578, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974) (emphasis in original), and we hold that it is unconstitutionally vague.[13]
 
 
 11
 AFFIRMED.
 
 
 12
 JERRE S. WILLIAMS, Circuit Judge, specially concurring:
 
 
 13
 I concur in the decision of the majority in affirming the district court's holding that the two provisions of the Louisiana Code at issue are unconstitutional. I write separately because the majority opinion does not address adequately the constitutional issues raised by these two statutory provisions. The majority's analysis strains unnecessarily to restrict the scope of this case, resulting in unrealistic and unconvincing justifications for the decision.
 
 
 14
 Before turning my attention to the particular issues, I express my disapproval of the majority opinion taking upon itself a completely one-sided emphasis upon the "exceptionally severe and sustained criticism" of the Supreme Court's abortion jurisprudence, together with the naming of dissenting Supreme Court Justices who oppose that majority jurisprudence and the citation of a number of law review articles attacking the Supreme Court decisions. I do not believe such an expression has any place in this case which does not raise the basic issues concerning the legality of induced abortions. I studiously avoid taking sides on this issue, and I do not undertake to provide a balance to the expression of views in the panel opinion by citing the majority Supreme Court Justices who accept the constitutional right and the extensive scholarly commentary in support of the Supreme Court's decisions. In my view there is no place in this case for the citation of either those who support or oppose the Supreme Court's abortion jurisprudence. I disassociate myself from any indication of favoring or disapproving the Supreme Court decisions.
 
 
 15
 The legal issues in this appeal are readily decided under existing case law. Accordingly, this opinion neither critiques existing jurisprudence nor breaks new ground. In addressing the issues in this case, I consider them in the order the Louisiana abortion statute presents them: First, the prohibition against fetal experimentation and then the requirement that the woman who has had an induced abortion be notified by her physician concerning the disposal of the fetal remains. I do not question the majority opinion's succinct analysis upholding the standing of appellees to raise these questions.
 
 I. EXPERIMENTATION ON FETAL REMAINS
 A. Vagueness
 
 16
 The majority opinion invalidates this provision[1] on the ground that the terms "experiment" and "experimentation" are impermissibly vague, a ground not discussed by the district court nor raised by the parties on appeal. I cannot join in this conclusion.
 
 
 17
 In order to stike down a legislative enactment for vagueness, a court must determine that the enactment is impermissibly vague in all of its applications. Village of Hoffman Estates v. Flipside Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). An enactment is not vague merely because it is imprecise. Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971); Ferguson v. Estelle, 718 F.2d 730, 735 (5th Cir.1983). A statute is unconstitutionally void for vagueness only when no standard of conduct is outlined at all; when no core of prohibited activity is defined. Id. The result is an absence of objective standards by which to conform one's behavior. Invariably, enforcement must be subjective and erratic. Papachristou v. Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). This provision does not present such dangers.
 
 
 18
 The majority properly sets out that there are procedures that are undeniably medical "experiments" and procedures that are medical "tests." The majority finds a problem " 'in the center [where] there is a very broad area where diagnostic procedures of testing types overlap with experimentation procedures.' " This view, however, rests upon what I feel is a contrived definition of the term "experiment." It reasons that because medical "tests" are developed from medical "experiments," then many kinds of medical experiments may also be tests. This was the rationale offered by the witness upon whom the majority opinion relies, Dr. William Sternberg. He specifically emphasized that the ban "would inhibit further development in those areas of scientific endeavor."[2] These are not words of vagueness, but words of scientific policy.
 
 
 19
 It is my view that this attempted confusion between experimentation and tests is not in reality a vagueness claim. It is a claim that a ban on experimentation will inevitably preclude the development of tests that may prove beneficial in future medical and surgical treatment. This is in actuality a claim on the merits. Section 1299.35.13 prohibits general medical research on fetal remains that is not beneficial to the fetus. There is most certainly a "core" by which to apply this provision. Whatever other faults this ban on experimentation may harbor, vagueness is not one.
 
 
 20
 I turn now to the vagueness claim the parties brought before us, not relied upon by the majority opinion. The district court found Sec. 1299.35.13 unconstitutionally vague under the Fourteenth Amendment because the terms "unborn child" and "born as the result of abortion" failed to distinguish between lawful and criminal conduct. The district court found that because of this deficiency the statute " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.' " Margaret S., 597 F.Supp. at 636, quoting Colautti v. Franklin (citations omitted).
 
 
 21
 In particular, the district court reasoned that the term "unborn child" fails to distinguish between fetal tissue and maternal tissue. Both kinds of tissue become separated from the pregnant woman as a result of abortion. Distinguishing between the two in actuality is practically impossible. Additionally, the term "born as a result of abortion" does not distinguish between tissue that is the product of an induced rather than a spontaneous abortion.
 
 
 22
 Upon a review of Sec. 1299.35.13, I would not sustain the district court's judgment of vagueness on this issue. Although the term "unborn child" fails to distinguish between fetal and maternal tissue, it is not unconstitutionally vague. No statute can effectively ban only fetal experimentation. Prohibiting experimentation on an "unborn child" invariably bars experimentation on maternal tissue associated with, and inseparable from, fetal tissue. A person who desires to perform research on fetal tissue is obviously aware of this. See Hygrade Provision Co. v. Sherman, 266 U.S. 497, 502, 45 S.Ct. 141, 142, 69 L.Ed. 402 (1925)(when penal statute is directed towards particular profession, the meaning of the statutory language should be interpreted as would one engaged in this profession). If there is statutory defect, it is not in vagueness but in overbreadth.
 
 
 23
 The term "born as a result of abortion" is also constitutionally acceptable as against a claim of vagueness. Although it may be true that tissue obtained from an induced abortion cannot be distinguished from that obtained from a spontaneous abortion, a prospective researcher is provided by statutory definition with fair notice of what is lawful. Section 40:1299.35.1(1) defines abortion as the "deliberate termination of a human pregnancy...." Section 1299.35.13, therefore, prohibits only experimentation on tissue produced by an induced abortion. One need only refer to the provision of the abortion statute that provides definitions to find this out. Moreover, the constitutional "requirement of fair warning is satisfied if a statute suggests the need to seek legal advice and if the statute's meaning might reasonably be determined through such advice." See LaFave & Scott, Criminal Law Sec. 11 & n. 25 (1972).
 
 
 24
 Although imprecisely drafted, Sec. 1299.35.13 is not unconstitutionally vague. As against a claim of vagueness, it provides ample warning to those who undertake to act within its purview. A prospective researcher would be required only to inquire as to the source of the fetal tissue upon which he wishes to experiment.
 
 
 25
 B. State Interest in Prohibiting Experimentation
 
 
 26
 A state may exercise its police powers to ensure public health, safety and welfare. Great Atlantic & Pacific Tea Co., Inc. v. Cottrell, 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976). The regulation of medical experimentation is a proper exercise of this authority. A state's authority in this context is admittedly broad. Id. The exercise of these police powers, however, must be rationally related to important state interests. See England v. Louisiana State Bd. of Med. Examiners, 263 F.2d 661, 667 (5th Cir.), cert. denied, 359 U.S. 1012, 79 S.Ct. 1149, 3 L.Ed.2d 1036 (1959); Louisiana State Bd. of Embalmers v. Britton, 154 So.2d 389, 390, 244 La. 756 (1963). Section 40:1299.35.13 fails to bear such a rational relationship to an important state interest.
 
 
 27
 Although Louisiana seeks to prohibit experimentation on tissue obtained from induced abortions it imposes no comparable restrictions on experimentation on human tissue. Indeed, Louisiana law specifically provides for the use of human corpses for the purposes of research. La.R.S.A. Sec. 17:2353. The evidence presented at trial failed to establish that tissue derived from an induced abortion presents a greater threat to public health or other public concerns than the tissue of human corpses. Further, no rational justification is shown for prohibiting experimentation on fetal tissue from a lawful induced abortion as opposed to a spontaneous abortion. There was no showing that Sec. 1299.35.13 in prohibiting experimentation on fetal tissue only in the instance of lawful induced abortions has any rational relationship to any legitimate state interest. The record is lacking in showing valid state policy in any of these distinctions. I can only conclude that under the guise of police regulation the state has actually undertaken to discourage constitutionally privileged induced abortions. Thornburgh v. American College of Obstetricians & Gynecologists, --- U.S. ----, ----, 106 S.Ct. 2169, 2178, 90 L.Ed.2d 779 (1986). I would affirm the judgment of the district court on this ground.
 
 II. DISPOSITION OF FETAL REMAINS
 
 28
 I turn now to the issue of the constitutionality of Sec. 40:1299.35.14 concerning the disposal of fetal remains.[3] Relying on City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), the majority affirms the summary judgment of the district court striking down this provision because there was no showing that only a physician could provide this information to a woman. The majority reserves any judgment as to the validity of this provision if it simply required that the woman who had had an abortion be informed by some means of the options for disposal of fetal remains. In my view the holding of the majority, in abandoning the rationale of the district court, is too narrow.
 
 
 29
 A woman's decision made in consultation with her physician to terminate her pregnancy before the fetus becomes "viable" outside the womb is established as a fundamental right. Roe v. Wade, 410 U.S. 113, 163, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973); Harris v. McRae, 448 U.S. 297, 312, 100 S.Ct. 2671, 2686, 65 L.Ed.2d 784 (1980). This right may not be infringed absent a compelling state interest and then only through regulation reasonably designed to further this interest. City of Akron, 462 U.S. at 427, 103 S.Ct. at 2491. A state may not seek to make a woman's exercise of her right to an abortion more burdensome or expensive than it need be. Id. at 435, 103 S.Ct. at 2495. The imposition of state requirements of the kind here at issue upon anyone advising or working with a woman who has opted for an abortion is such a burden. Unless the state presents a compelling reason for doing so, such a regulation must fail. Id. at 444, 103 S.Ct. at 2500. A physician's role in advising or assisting a woman making and carrying out the choice to have an abortion is a fundamental feature of the exercise of this right. See Id. at 448, 103 S.Ct. at 2502; Colautti, 439 U.S. at 387, 99 S.Ct. at 681 (1979). The panel majority's view encourages the state to amend its statute to force a woman to be informed of the options even against the conclusion of her attending physician that such a notification would be harmful to her. Thus, the Louisiana statute would inhibit a physician's duty of care to his or her patient even if it were amended to remove the duty of required notification from the physician and place it upon someone else.
 
 
 30
 The decision to have an abortion undoubtedly is a difficult decision for many women. Planned Parenthood, 428 U.S. at 67, 96 S.Ct. at 2840. Informing a woman who has just undergone an abortion that she may decide as to the disposition of fetal remains could well exacerbate this anxiety. Disposal by cremation or burial, for instance, may endow the fetus with a humanlike dignity. This may create the constitutionally unacceptable impression that any fetus is a person. Thornburgh, supra, --- U.S. at ----, 106 S.Ct. at 2188. (Stevens, J., concurring). Conversely, Sec. 1299.35.14 may result in unnecessary stress upon some women by stripping all dignity and solemnity from the event. For example, a common method for disposing of fetal remains in many abortion clinics is through the local sewer system.[4] Informing a woman who has just had an abortion that the fetal remains can be disposed of in this way appears to be nothing more than a cruel tactic to induce a feeling of guilt.
 
 
 31
 The decision of whether and when a woman should be asked or informed about the disposal of fetal remains is a significant aspect of the physician's care of his or her patient. The attending physician understands his patient and the situation better than a distant legislature. There is, moreover, no legitimate state interest that I can discern or that was shown at the trial for placing this burden upon a woman who has just undergone an abortion.
 
 
 32
 Of course, the state of Louisiana has the authority and the obligation to ensure that the tissue produced by abortions be disposed of in an appropriate manner. This is a proper exercise of the state's police power. But the exercise of that power is not at issue. Disposal of fetal remains in Louisiana has thus far been properly handled by Louisiana abortion clinics and attending physicians without any adverse consequences to public health. There is no need shown for the state to compel a woman to be informed of the options for disposal. State interference in the decision of how to dispose of fetal remains among lawful and appropriate options is a clear interference in the attending physician's judgment. The state makes no showing of greater state interest in consultation with patients as to the disposal of fetal remains than in the disposal of amputated portions of the body or other human tissue excised during surgery.
 
 
 33
 The inquiry required by the statute of women who have just undergone abortions also is not shown to advance the state's interest in maternal health. Evidence as to the psychological effect of this information was presented by both sides. The district court found the appellees' evidence more persuasive. As this is a factual determination, we are bound by that finding because it is not clearly erroneous. Williamson v. Brown, 646 F.2d 196, 199 (5th Cir.1981). Even if we were not so bound, however, we should be hard-pressed to accept the state's evidence as persuasive. It stretches credibility to conclude that this requirement would promote benefits to the psychological health of the women involved as against her physician's conclusion to the contrary.
 
 
 34
 I emphasize my difference with the majority opinion in its attempt in footnote 9 to place a restricted and distorted analysis upon the Supreme Court's holding in Thornburgh. I note first that in using the phrase "a bare majority of the Court", the opinion again enters into the issue of the merits of the overall abortion controversy which, as I pointed out earlier, has no place in this case. Thornburgh is the law, and we must follow it.
 
 
 35
 But more critical is the emphasis in footnote 9 that Thornburgh did not deal with a post-abortion requirement as does this case. Doubt is implied about the full import of the Supreme Court's holding by saying it cannot be read to forbid a sole requirement that the giving of potentially unwelcome information to the woman is forbidden. This conclusion unduly restricts the clear import of Thornburgh in two respects as it applies to this case. First, here involved is more than imparting information. It is pressuring the woman to make a choice. Second, and more important however, is the fact that the entire theme of Thornburgh is to forbid intimidating women from exercising their constitutional right or creating unjustified anxiety in the exercise of that right. There is even less justification for a state to require information be given the woman and to require her to choose an option after the legal abortion procedure. Then the only discernible purpose of the state compulsion is to increase her feelings of anxiety, concern, and possible wrongdoing for exercising her constitutional right. Thornburgh unequivocally prohibits a state's legislating for such a purpose. --- U.S. at ----, ---- - ----, ----, ----, 106 S.Ct. at 2178, 2179-2180, 2182, 2184
 
 
 36
 Because Sec. 1299.35.13 unduly straitjackets an attending physicians' professional judgment in the care of his or her patients who desire abortions, it presents an unconstitutional infringement on a woman's reproductive freedom. I would hold this provision unconstitutional on this ground, following the established law of City of Akron, 462 U.S. at 442, 103 S.Ct. at 2499; Planned Parenthood, 428 U.S. at 67 n. 8, 96 S.Ct. at 2840 n. 8; and Roe v. Wade, 410 U.S. at 163, 93 S.Ct. at 732. My decision in no way would constrain a woman's choice to dispose of fetal remains in any manner she feels is fitting so long as it is lawful. Nor would my decision prevent a physician from informing or asking the patient of her choices for disposal. I conclude only that a state may not compel that a woman be notified of the options when her physician or others responsible for her well being feel such notification is not in the best interests of the woman.
 
 III. CONCLUSION
 
 37
 I would affirm the district court's judgment for the foregoing reasons. Because the majority opinion does not face these issues although they are clearly before us, I file this special concurrence.
 
 
 
 [1]
 See, e.g., Roe v. Wade, 410 U.S. 113, 171-77, 93 S.Ct. 705, 736-39, 35 L.Ed.2d 147 (1973)(Rehnquist, J., dissenting); Doe v. Bolton, 410 U.S. 179, 221-23, 93 S.Ct. 739, 762-63, 35 L.Ed.2d 201 (1973)(White, J., dissenting); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 92-101, 96 S.Ct. 2831, 2851-2856, 49 L.Ed.2d 788 (1976)(White, J., dissenting); City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 2504-17, 76 L.Ed.2d 687 (1983)(O'Connor, J., dissenting); Thornburgh v. American College of Obstetricians & Gynecologists, --- U.S. ----, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986)(Burger, C.J., dissenting); id. (White, J., dissenting); id. (O'Connor, J., dissenting)
 
 
 [2]
 See, e.g., Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920 (1973); Wellington, Common Law Rules and Constitutional Double Standards: Some Notes on Adjudication, 83 Yale L.J. 221, 297-311 (1973); Epstein, Substantive Due Process by Any Other Name: The Abortion Cases, 1973 Sup.Ct.Rev. 159; Gunther, Some Reflections on the Judicial Role: Distinctions, Roots, and Prospects, 1979 Wash.U.L.Q. 817, 819; A. Bickel, The Morality of Consent 27-29 (1975); J.H. Ely, Democracy and Distrust 2-3, 248 n. 52 (1980)
 
 
 [3]
 Judge Williams' disapproval of our allusions to the debate over the Supreme Court's abortion decisions is misplaced. Although we have not undertaken to criticize the Supreme Court, we do not believe it would be improper to do so. Cf. United States v. Dennis, 183 F.2d 201, 207-12 (2d Cir.1950)(Hand, C.J.), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); United States v. Roth, 237 F.2d 796, 801 (2d Cir.1956)(Frank, J.); Salerno v. American League of Professional Baseball Clubs, 429 F.2d 1003, 1005 (2d Cir.1970) (Friendly, J.); Dronenburg v. Zech, 746 F.2d 1579, 1583-84 (D.C.Cir.1984) (on petition for rehearing en banc ) (statement of Bork, J., joined by Scalia, J.). Indeed, the Supreme Court itself has implicitly encouraged the lower courts to offer it responsible criticisms of its decisions. See, e.g., Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 867, 95 L.Ed. 1137 (1951) (plurality opinion). In any case, our references to the debate over the abortion decisions are not gratuitous, but are meant to help explain why we think it proper to decide this case as we have. While we are unquestionably bound to obey the Supreme Court, we are not obliged to give expansive readings to a jurisprudence that the whole judicial world knows is swirling in uncertainty. We think that Judge Williams' analysis would unnecessarily put new restrictions on the states, restrictions that the Supreme Court has not yet, and may not ever, require. Because we think that this expansion of substantive due process would be ill-advised, we decline to anticipate commands from the high court that may never come
 
 
 [4]
 This subsection goes on to state quite emphatically that the Louisiana legislature disagrees with the premises of the Supreme Court's abortion jurisprudence and expresses an intent to enforce the state's pre-Roe v. Wade policy as soon as that becomes legally possible. Although the district court found this expression of legislative intent relevant to its determination of the constitutionality of the statute, 597 F.Supp. at 644-45 & n. 1, we do not believe that the Supreme Court has gone as far as to command the states to adopt a policy of unquestioning agnosticism about the morality of abortion. Cf., e.g., Thornburgh v. American College of Obstetricians & Gynecologists, --- U.S. ----, ----, 106 S.Ct. 2169, 2184, 90 L.Ed.2d 779 (1986) ("[A]bortion raises moral and spiritual questions over which honorable persons can disagree sincerely and profoundly."); id. (Stevens, J., concurring) at ----, 106 S.Ct. at 2188 (Supreme Court is not "imposing value preferences on anyone else"). But cf. id. (majority opinion), at ----, 106 S.Ct. at 2180 (state's treating abortion differently than it treats necessary surgery or simple vaccination "reveals the anti-abortion character of the statute and its real purpose")
 
 
 [5]
 See, e.g. H.L. v. Matheson, 450 U.S. 398, 411-13, 101 S.Ct. 1164, 1172-73, 67 L.Ed.2d 388 (1981) (acknowledging the peculiar nature of abortion and the state's legitimate interest in discouraging its occurrence); Harris v. McRae, 448 U.S. 297, 325-26, 100 S.Ct. 2671, 2692-93, 65 L.Ed.2d 784 (1980) (criticizing a lower court for taking away from a legislature (in this case Congress) the prerogative of balancing the fetus' interests against those of the mother); Maher v. Roe, 432 U.S. 464, 473-74, 97 S.Ct. 2376, 2382-83, 53 L.Ed.2d 484 (1977) (the states are free "to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.... [and are free to make] childbirth a more attractive alternative, thereby influencing the woman's decision...."); id. at 479-80, 97 S.Ct. at 2385-86 (emphasizing the importance of leaving the legislatures free to make legislative choices); Beal v. Doe, 432 U.S. 438, 447-48 n. 15, 97 S.Ct. 2366, 2372-73 n. 15, 53 L.Ed.2d 464 (1977) ("[A]nguish over the perceived impact of [the Court's allowing government to refuse to subsidize abortions] ... misconceive[s] ... the role of the judiciary.... The issues present policy decisions of the widest concern. They should be resolved by the representatives of the people, not by this Court."); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 66-67, 96 S.Ct. 2831, 2839-2840, 49 L.Ed.2d 788 (1976) (emphasizing the importance of informed consent to abortion); Roe v. Wade, 410 U.S. 113, 162-64, 93 S.Ct. 705, 731-32, 35 L.Ed.2d 147 (1973) (recognizing the importance of allowing state regulation of abortions). Cf. Thornburgh v. American College of Obstetricians & Gynecologists, --- U.S. ----, ----, 106 S.Ct. 2169, 2178, 90 L.Ed.2d 779 (1986) ("The States are not free, under the guise of protecting maternal health or potential life, to intimidate women into continuing pregnancies.... [or to] wholly subordinate constitutional privacy interests and concerns with maternal health in an effort to deter a woman from making a decision that, with her physician, is hers to make.") (emphasis added). But cf. id. (White, J., dissenting), at ----, 106 S.Ct. at 2198 ("[T]he majority makes it clear from the outset that it simply disapproves of any attempt by Pennsylvania to legislate in [the abortion] area.")
 
 
 [6]
 The language of the statute is somewhat awkward and indirect, but the parties, the district court, and the state administrative agency charged with promulgating the implementing regulations have all construed it as we do. La.Rev.Stat.Ann. Sec. 40:1299.35.14 provides:
 A. Each physician who performs or induces an abortion which does not result in a live birth shall insure that the remains of the child are disposed of in accordance with rules and regulations which shall be adopted by the Department of Health and Human Resources.
 B. The provisions of this Section shall not apply to, and shall not preclude, instances in which the remains of the child are provided for in accordance with the provisions of R.S. 8:651 et seq.
 C. The attending physician shall inform each woman upon whom he performs or induces an abortion of the provisions of this Section within twenty-four hours after the abortion is performed or induced.
 R.S. 8:651 provides that most human remains "shall be decently interred or cremated within a reasonable time after death." The state's Department of Health and Human Resources has issued regulations providing that unless the mother chooses cremation or burial, the physician or hospital shall arrange for the fetal remains to be disposed of either by incineration or through the municipal sanitary disposal system.
 
 
 [7]
 The City of Akron Court objected to this "unreasonable" insistence because it might "in some cases add to the cost of providing abortions...." 103 S.Ct. at 2502. This objection applies equally to disclosures that are required before and after abortions
 
 
 [8]
 See, e.g., City of Akron, 103 S.Ct. at 2502-03; Thornburgh v. American College of Obstetricians & Gynecologists, --- U.S. ----, ----, 106 S.Ct. 2169, 2178, 90 L.Ed.2d 779 (1986) ("A requirement that the woman give what is truly a voluntary and informed consent, as a general proposition, is, of course, proper and is surely not unconstitutional.")
 
 
 [9]
 In Thornburgh v. American College of Obstetricians & Gynecologists, --- U.S. ----, ---- & n. 10, 106 S.Ct. 2169, 2179-2180 & n. 10, 90 L.Ed.2d 779, & n. 10 (1986), a bare majority of the Court indicated its discomfort with statutes requiring that women be provided with what the majority considered inflammatory information. The Court, however, was considering an "informed consent" statute that operated prior to a woman's undergoing an abortion. In any case, the Thornburgh Court did not clearly hold that the potentially unwelcome nature of information is by itself sufficient to prevent the states from requiring that the information be provided
 
 
 [10]
 "Abortion" is defined to mean "the deliberate termination of a human pregnancy after fertilization of a female ovum, by any person, including the pregnant woman herself, with an intention other than to produce a live birth or to remove a dead unborn child caused by a spontaneous abortion." La.Rev.Stat.Ann. Sec. 40:1299.35.1(1). Experimentation on the remains of a spontaneous abortion is therefore apparently not prohibited. "Unborn child" is defined to mean "the unborn offspring of human beings from the moment of conception through pregnancy and until termination of the pregnancy." La.Rev.Stat.Ann. Sec. 40:1299.35.1(2)
 
 
 [11]
 The state's brief does not offer any explanation of the purpose of the prohibition of experiments on the fetus or child that emerges as a result of an abortion. We can hypothesize that Louisiana wanted to remove some of the incentives for research-minded physicians either to promote abortions or to manipulate the timing of abortions in an effort to acquire fetal remains of a desired maturity. The statute is therefore rationally related to an important state interest. Cf. Maher v. Roe, 432 U.S. 464, 473-74, 97 S.Ct. 2376, 2382-83, 53 L.Ed.2d 484 (1977)
 
 
 [12]
 The plaintiffs' expert gave as one example a pathological examination in which the physician tests for "correal carcenomia [sic], which is [a] highly malignant tumor, cancer, that is of fetal origin and it is capable of invading and killing the mother."
 
 
 [13]
 This of course does not imply that the states are powerless to regulate medical experimentation. Because of the nature of the vagueness doctrine, any holding that a statute is unconstitutionally vague must necessarily be highly case-specific. A statute using more precise language than that used in R.S. 40:1299.35.13, whether it applied to fetal experimentation or other forms of medical research, would present a different case than the one we decided today
 
 
 [1]
 The text of this statutory provision is set out at the beginning of Part IV of the majority opinion
 
 
 [2]
 The following exchange between appellees' attorney and Dr. Sternberg demonstrates this fact
 BY MS. HUNTER:
 Q. Dr. Sternberg, you mentioned just then the testing as well as experimentation. As a pathologist and considering the pathological examination of aborted fetal tissue, what is the reason that you stated that you could not be clear as to the distinction between experimentation and testing?
 A. Well, there is no satisfactory sharp distinction between the term testing and experimentation as applied to science, generally, in the statute, there is no guidelines as to what is meant by this. Let me put it this way: every test that we know that is used routinely and which we may refer to as standard test people understand that ordinarily as the sort of thing that one might have as one checks into the hospital and has tests for blood, sugar and other procedures. These are standard tests, but every test of that sort started out as an experiment and in the initial stage of that it was done by a variety of experimental groups who are dealing with this particular form of testing. When it becomes standardized, then it became a test rather than an experimentation. But every modification of that test, every new development, every addition, sophisticated techniques revised for doing it, that would prove medical knowledge and make it more specific would also be experimentation. So it is very difficult, we have at one end things that are obviously standard tests and the other end things that are complete experimentation. But in the center there is a very broad area where diagnostic procedures of testing types overlap with experimentation procedures and to inhibit that sort of study would inhibit further development in these areas of scientific endeavor.
 
 
 [3]
 The text of this statutory provision is printed in footnote 5 of the majority opinion
 
 
 [4]
 This means of disposal is approved by regulations of the Louisiana Health and Human Services Department