REQUESTED BY: Senator Jim Jensen
You have requested an analysis of potential legislation prohibiting the use of tissue, cells, organs or other materials from a human fetus or child who has been the subject of an elective abortion for the purpose of biomedical or other research. Specifically, you have inquired whether such legislation would be permissible in light of constitutional provisions, caselaw and current federal legislation permitting the federal funding of such research. You have not asked us to review any specific legislative bill. Accordingly, our analysis is of a general nature.
This opinion will examine U.S. Supreme Court decisions, relevant federal statutes, caselaw from other jurisdictions on this topic, and current Nebraska law. Areas of analysis will include potential challenges based on abortion rights, vagueness, exercise of police power and preemption.
The opinion concludes that the Legislature may ban research and experimentation using tissue or organs from aborted human infants if the legislation is properly drafted.
 I. Application of Abortion Jurisprudence To Legislation Regulating the Use of Aborted Human Infants
Abortion was legalized nationwide by the U.S. Supreme Court in 1973. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705 (1973). Since that time approximately 140,000 pre-born infants have been aborted in Nebraska according to State HHS data. In recent years, one of every five unborn children in Nebraska have been aborted. In response to this situation, the Nebraska legislature has adopted, and recently reaffirmed, a policy position of providing "protection for the life of the unborn child whenever possible." Neb. Rev. Stat. Ann. § 28-325
(Michie Supp. 1997). Severe restrictions on abortion-related legislation, however, have been imposed by the federal courts. Thus, the first area of inquiry concerns the application of abortion jurisprudence to a possible ban on use of human fetal tissue obtained from elective abortions.
To determine whether abortion jurisprudence restricts or prohibits such legislation it is important to first identify the specific right protected by abortion cases. The right protected under Planned Parenthood of Southeastern Pennsylvania v. Casey,505 U.S. 833, 112 S.Ct. 2791 (1992), is the woman's "freedom to decide whether to terminate her pregnancy." Casey,112 S.Ct. at 2819 (emphasis added). The Supreme Court has stated that State regulations on abortion will be upheld "which in no real sense deprive the woman of the ultimate decision." Id. Regulations will be upheld "if they are not a substantial obstacle to the woman's exercise of the right to choose." Id. Thus, "only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." Id.
Under Casey there is a wide disparity between a State's ability to restrict the "reproductive choices" of individual women, and the State's ability to promote childbirth over abortion in general. In the former instance, the States may not impose any "undue burden" on the decision of a specific woman to abort her unborn child. In contrast, however, States are free to adopt general policies and positions favoring childbirth over abortion.Casey, 112 S.Ct. at 2821. See also Webster v. Reproductive HealthServices, 492 U.S. 490, 506 (1989) ("The Court has emphasized thatRoe v. Wade implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion.") (quoting Maher v. Roe, 432 U.S. 464, 474 (1977)).
The Supreme Court has also made it clear a State may not only make a value judgment favoring childbirth over abortion, but it may actively implement this policy. For example, a State may openly express concern for the life of unborn children from conception on. Casey, 112 S.Ct. at 2816 ("The woman's liberty is not so unlimited, however, that from the outset the State cannot show its concern for the life of the unborn."). The State may also create structural mechanisms by which the State "may express profound respect for the life of the unborn." Casey,112 S.Ct. at 2821. The State may adopt measures designed to persuade women "to choose childbirth over abortion." Casey, 112 S.Ct. at 2821. The State may implement policies and programs that make "childbirth a more attractive alternative, thereby influencing the woman's decision [whether to abort her child]." Webster v. ReproductiveHealth Services, 109 S.Ct. 3040, 3051 (1989). The State may "use public facilities and staff to encourage childbirth over abortion." Webster, 109 S.Ct. at 3052. The "State may make a value judgment favoring childbirth over abortion and . . . implement that judgment by the allocation of public funds.'"Webster, 109 S.Ct. at 3052 (quoting Maher, 97 S.Ct. at 2382). Significantly, the implementation of a State's policy favoring childbirth over abortion may also involve "the allocation of public resources, such as hospitals and medical staff." Id.
Thus, a properly drafted ban on research and experimentation using tissue or organs from aborted children does not directly implicate or offend Casey since it would regulate use of the body of the child and not the ability to terminate the pregnancy.[1] Furthermore, to the extent the statute is intended to discourage abortion generally, or at least avoid encouraging abortion, the Supreme Court has explicitly recognized the right of States to enact legislation to achieve this purpose.
 II. Existing State Law Governing Research on Aborted Infants
Current Nebraska law provides that "No person shall knowingly, intentionally, or willfully use any premature infantaborted alive for any type of scientific, research laboratory, or other kind of experimentation except as necessary to protect or preserve the life or health of such premature infant aborted alive. Violation of this section is a Class IV felony." Neb. Rev. Stat. Ann. § 28-346 (Michie 1995) (emphasis added). This statute, by its express terms, applies only to premature infants aborted alive. Consequently, its application is limited to this context. Any research on a premature infant aborted alive which results in his or her death is also prosecutable as a homicide. Neb. Rev. Stat. Ann. § 28-302 (Michie 1995) (defining "person", when referring to the victim of a homicide, as a human being who had been born and was alive at the time of the homicidal act). We note, however, that articles alleging precisely this activity (live late term babies being killed and then dissected for parts to meet research demands) contributed to a nationwide and local outcry against such research.
 III. Existing Federal Law on Fetal Tissue Research
Current Federal law provides: "The Secretary [of HHS] may conduct or support research on the transplantation of human fetal tissue for therapeutic purposes." 42 U.S.C. § 289 g-l(a). Such fetal tissue may come from abortions. § 289 g-l(b). This research is not unlimited, however. First of all, the express language of the statute permits funding only for research ontransplantation for therapeutic purposes. Furthermore, such research may be conducted "only in accordance with applicable State and local law." 289 g-l(e). Federal law is also limited in another significant way. 42 U.S.C. § 289 g(a) prohibits federal research or support of research or experimentation on a nonviableliving human fetus ex utero or a living human fetus ex utero for whom viability has not been ascertained. . . ." (emphasis added). Exceptions are provided for procedures to meet the health needs of the fetus or where such research poses no added risk of suffering, injury, or death to the fetus. Id.[2] Similarly, 45 CFR § 46.209 prohibits research involving nonviable fetuses ex utero unless the research would not cause death. In addition, 45 CFR § 46.208 prohibits research which involves fetuses in utero unless done for the health needs of the mother. Thus, the "donors" must be both dead and delivered.
Other federal regulations further restrict the scope of federally funded research. 45 CFR § 46.206 provides that "No procedural changes [to an abortion procedure] may be made for purposes of the research if they increase risk to the mother or fetus.
In addition, federal law also contains a prohibition on selling fetal tissue. The law provides that it is "unlawful forany person to knowingly acquire, receive, or otherwise transferany human fetal tissue for valuable consideration if the transfer affects interstate commerce." 42 U.S.C. § 289g(2)(a) (emphasis added). This prohibition on selling tissue contains a big loophole, however, since the definition of "valuable consideration" expressly excludes payments for transportation, processing, preservation, quality control, or storage of human fetal tissue. 42 U.S.C. § 289 (g) (d) (3).
45 CFR § 46.210 echoes 42 U.S.C. § 289-g-1(e), and provides that experimentation using tissue from aborted fetuses "shall be conducted only in accordance with any applicable State or local laws regarding such activities."
In sum, federal law permits research or funding of research by the federal government using tissue from aborted human infants. However, this is limited to research on transplantation for therapeutic purposes. No research is permitted until the fetus is delivered from the mother and the child is dead. Abortion procedures may not be altered for purposes of the research if they increase risk to the mother or fetus. Direct payments for human fetal tissue are prohibited. Finally, the research must be conducted in accordance with State law.
 IV. Application of Vagueness Analysis to Fetal Tissue Statutes
Perhaps the biggest challenge in drafting legislation prohibiting the use of organs and tissue from aborted human infants for experimentation and research is avoidance of "vagueness" problems pursuant to caselaw under the Due Process Clause of the Fourteenth Amendment. If a statute "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, the law is void for vagueness." Colautti v. Franklin, 439 U.S. 379, 390,99 S.Ct. 675, 683 (1979).
Several state statutes banning use of aborted infants for experimentation have been reviewed by federal courts. In MargaretS. v. Edwards, 794 F.2d 994 (5th Cir. 1986), the court reviewed a Louisiana statute which provided, "No person shall experiment on an unborn child or a child born as the result of an abortion, whether the unborn child or child is alive or dead, unless the experimentation is therapeutic to the unborn child or child." Id. at 998 (quoting La. Rev. Stat. Ann. § 40:1299.35.13). The court concluded that because the statute failed to define "experiment" or "experimentation" the statute was void for vagueness. Id. at 999.
In Lifchez v. Hartigan, 735 F. Supp. 1361 (N.D.Ill. 1990),aff'd. 914 F.2d 260 (1990), the plaintiff challenged the constitutionality of an Illinois statute stating that "No person shall sell or experiment upon a fetus . . . unless such experimentation is therapeutic to the fetus. . . ." Id. at 1363. The court held that the statute's failure to define "experimentation" and "therapeutic" made it unconstitutionally vague. Id. at 1376. The court also held the law violated Roe v.Wade by intruding upon reproductive choice. In this regard the court focused on the possibility that the statute, as drafted, could prohibit embryo transfers intended to help infertile women get pregnant. Id. at 1377.
In Jane L. v. Bangerter, 61 F.3d 1493, 1500-1502 (10th Cir. 1995) (rev'd and remanded on other grounds sub nom. Leavitt v.Jane L., 518 U.S. 137 (1996)), the court found Utah's statute banning "experimentation" on live unborn children to be unconstitutionally vague due to the lack of a definition of the "experimentation." Most recently, in Forbes v. Woods,71 F. Supp. 2d 1015 (D.Ariz. 1999), the court reviewed an Arizona statute prohibiting experimentation on human fetuses from induced abortions. The court held the statute to be unconstitutionally vague, finding the terms, "experimentation", "investigation" and "routine" to be ambiguous terms. Id. at 1019.[3]
Despite the difficulties experienced by several States in the above cases, it is quite possible to draft a constitutional statute. As the Fifth Circuit noted in Edwards, with regard to its vagueness conclusion, "This of course does not imply that the States are powerless to regulate medical experimentation. Because of the nature of the vagueness doctrine, any holding that a statute is unconstitutionally vague must necessarily be highly case-specific. A statute using more precise language . . . would present a different case. . . ." 794 F.2d at 999 n. 13. Thus, a statute could be drafted which would avoid a vagueness problem. To achieve this result, all important terms should be clearlydefined, and an intent or scienter requirement should be included to help mitigate any ambiguity. See Village of Hoffman Estates v.Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S.Ct. 1186
(1982).
 V. Regulation of Fetal Experimentation as an Exercise of the State's Police Power
To qualify as a legitimate exercise of the State's "police power" a statute regulating fetal experimentation must be rationally related to an important state interest. In Margaret S.v. Treen, 597 F. Supp. 636, 674 (E.D.La. 1984), the district judge held that Louisiana's ban on experimentation on aborted children "is not justified by any legitimate state interest furthered by the statute." On appeal, however, the Fifth Circuit had little trouble finding a legitimate state interest. The Fifth Circuit noted the State's lack of an "explanation of the purpose of the prohibition on experiments on the fetus or child that emerges as a result of an abortion." Margaret S. v. Edwards, 794 F.2d 994, 998
n. 11 (5th Cir. 1986). However, the court then stated, "We can hypothesize that Louisiana wanted to remove some of the incentives for research-minded physicians either to promote abortions or manipulate the timing of abortions in an effort to acquire fetal remains of a desired maturity. The statute is thereforerationally related to an important state interest." Id. (emphasis added).
A concurring opinion from the Firth Circuit decision inEdwards is also noteworthy. Circuit Judge Williams strenuously disagreed that the statute was unconstitutionally vague, but concluded it was still invalid. In his view a prohibition on fetal research using aborted infants "fails to bear . . . a rational relationship to an important state interest" so as to be a valid exercise of the state's police powers. Id. at 1002 (Williams, concurring). This analysis is noteworthy because it is predicated upon the proposition that "no rational justification is shown for prohibiting experimentation on fetal tissue from a lawful induced abortion as opposed to a spontaneous abortion."Id. Judge Williams concluded, "There was no showing that [Louisiana statute] § 1299.35.13 in prohibiting experimentation on fetal tissue only in the instance of lawful induced abortion has any rational relationship to any legitimate state interest. The record is lacking in showing valid state policy in any of these distinctions. I can only conclude that under the guise of police regulation the state has actually undertaken to discourage constitutionally privileged induced abortions." Id. at 1002. (emphasis added). This analysis, written in 1986, is a legal nonsequitur today in light of subsequent case law from the Supreme Court, including Casey. As discussed in section I, a State may clearly take action to discourage induced abortions.
Despite changes in caselaw since Edwards, it is still essential for the legislature to put forward a rational basis for treating aborted children's corpses differently than other human corpses.[4] One commentator argued there is no such rational basis. See Gregory Gelfand Toby R. Levin, Fetal TissueResearch: Legal Regulation of Human Fetal Tissue Transplantation, 50 Wn. Lee L. Rev. 647, 682 (1993). However, as discussed below, it appears such commentators try not to think too hard to find a rational distinction.
A statute prohibiting the use of tissue and organs from aborted children for research and experimentation could serve a number of legitimate State interests which have been recognized by courts. First, the State may enact provisions aimed at preserving respect for human life. Casey, 112 S.Ct. at 2821. Second, the State has an interest in maintaining the integrity of the medical profession. Washington v. Glucksberg, 521 U.S. 702,117 S.Ct. 2258 (1997) ("The State has an interest in protecting the integrity and ethics of the medical profession. "[discussing the risk of "blurring the time-honored line between healing and harming."]). Third, the State may enact policies and laws to discourage abortion and promote childbirth. Casey,112 S.Ct. at 2821. This interest would likely encompass a policy against legitimizing abortion through such fetal research. In this regard we note that during our research on this opinion we came into possession of a promotional brochure by a division of Consultative and Diagnostic Pathology, Inc. called "Opening Lines". This brochure states the company was formed "to maximize the utilization of fresh fetal tissue we process." In large letters, the brochure advertises "Fresh Fetal Tissue harvested and shipped to your specifications . . . where and when you need it". In equally large print, the brochure states "Find Out How You CanTurn Your Patient's Decision Into Something Wonderful." (emphasis added). Such evidence would tend to support a State interest in avoiding the legitimization of abortion through use of the corpses for research.
Fourth, the State has an interest in preventing unnecessary pain and suffering to unborn children, despite the fact the State cannot prevent their death. See Planned Parenthood of Wisconsinv. Doyle, 162 F.3d 463, 477-78 (7th Cir. 1998) (Manion, dissenting) (discussing the state interest in preventing "cruel and gruesome" procedures on the unborn during an abortion and comparing statutes which criminalize the shooting of caged animals.). It is true that this state interest applies only to the extraction of tissue or organs from living unborn children, before, during or after an abortion. However, it appears the "donors" are not always dead when their tissue is harvested. As one proponent of fetal tissue experimentation has acknowledged "Although a great number of authors have assumed that the UAGA [Uniform Anatomical Gift Act] . . . is applicable to all fetal tissue transplants, a minor problem is presented because somefetal tissue is taken from fetuses which, while nonviable, are notdead. The UAGA does not apply to tissue donations from livepersons. . . ." Fetal Tissue Research: Legal Regulation of HumanFetal Tissue Transplantation, 50 Wn. Lee L. Rev. at 671 (emphasis added).
In this regard we note that here in Nebraska, UNMC has thus far failed to respond to requests for information regarding whether the human brain tissue it obtains from aborted children is extracted while the child is still living. Dr. Carhart, UNMC's fetal tissue supplier, has testified previously that he removes brain tissue from living, partially-born children in a procedure he calls an "intact DE" (partial-birth abortion). Carhart v.Stenberg, 11 F. Supp.2d 1099 (1998). Although UNMC denies any fetal brain tissue it uses comes from partial-birth abortions, it is quite possible that whatever procedure is used, the child is living at the time the brain is extracted. Carhart,11 F. Supp.2d at 1106 (discussing various abortion techniques). Although these children are not likely viable, it should be noted that the State's interest in unborn human life, according to the Supreme Court, begins not at birth or viability, but at conception.Casey, 112 S.Ct. at 2817, 2821 (referencing the "State's profound interest in potential life, throughout pregnancy").
Finally, there is a fifth, and closely related state interest. The State has a legitimate interest in the "moral underpinnings of state law" which is served by statutory prohibition on activity deemed by the legislature to be immoral.Id. at 13. Planned Parenthood of Wisconsin v. Doyle,162 F.3d 463, 477-478 (7th Cir. 1998) (Manion, dissenting).[5] Simply put, the legislature may legitimately conclude that the harvesting of organs and tissue from the victims of elective abortion is wrong and would undermine respect for life and medical ethics.
In sum, it is important for legislation in this area to be drafted in furtherance of a legitimate State interest such as those discussed above in order to constitute a proper exercise of the State's police powers.
 VI. Preemption of State Law by Federal Law on Fetal Tissue Research
The existence of a federal law permitting the funding of certain fetal tissue research raises the issue of preemption. "The Supremacy Clause of the federal constitution dictates that a state law . . . cannot prevent the administration and execution of a federal statute." Missouri v. Glasgow, 152 F.3d 802 (8th Cir. 1998). However, "[i]n a pre-emption case . . . state law is displaced only `to the extent that it actually conflicts with federal law." Dalton v. Little Rock Family Planning Services,
516, U.S. 474, 116 S.Ct. 1063, 1064 (1996). Furthermore, courts are to "start with the assumption that the historic police powers of the states [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress" Ace Auto Body Towing,Ltd. v. City of New York, 171 F.3d 765, 771 (2nd Cir. 1999).
We do not believe the existing federal law would preempt a properly drafted state fetal experimentation research statute. The federal provisions discussed in section III above were enacted to authorize federal funding of fetal tissue research within certain narrow parameters. See National Institutes of Health Revitalization Act of 1993, 42 U.S.C. § 289 g-l et. seq.
The federal statutes do not, in our opinion, preempt State legislation of the type contemplated for several reasons. First, the federal statute covers only research done for "transplantation" purposes. Second, it is limited in application to dead corpses after complete delivery. Likewise, its payment prohibition is also narrow in scope, leaving room for additional regulation. Third, there is no express preemption of State law. On the contrary, the federal statute expressly acknowledges and defers to potential restrictions under state or local law. 42 U.S.C. § 289
g-l(e). See also 45 CFR § 46.210. Furthermore,45 CFR § 46.201 identifies the scope of applicability of "protections pertaining to research . . . involving fetuses. . . ." These regulations are applicable to all HHS grants and contracts supporting research involving fetuses. § 46.201(a). Section 46.201(b) provides that "Nothing in this subpart shall be construed as indicating that compliance with the procedures set forth herein will in any way render inapplicable pertinent State or local laws bearing upon activities covered by this subpart."
Another indication of the lack of preemption is the absence of this conclusion in recent litigation, as well as the continued existence of fetal research statutes in several states. For example, in Forbes v. Woods, 71 F. Supp.2d 1015 (D.Ariz. 1999), a ban on aborted fetal tissue research was challenged on no less than six different constitutional theories. Id. at 1016-1017. No allegation was made, however, that the statute was void under the Supremacy Clause due to federal preemption.
North Dakota currently has a statute banning use of a live fetus, or any tissue or organ thereof, resulting from an induced abortion in animal or human research, experimentation, or study, or for animal or human transplantation. N.D. ST. 14-02.2-01 (1997). North Dakota law also bans such experimentation on dead fetuses except for diagnostic or remedial procedures to assist the mother or for pathological study. Id. 14-02.2-02. Oklahoma law also currently provides that "No person shall experiment upon a child or an unborn child resulting from an abortion or which is intended to be aborted unless the experimentation is therapeutic to the child or unborn child." 63 OK. St. Sec. 1-735 (1997). "Experiment" is defined as excluding autopsies. Id.
Any concern over preemption can be mitigated in the contemplated legislation by expressly prohibiting types of research and experimentation on aborted children which are clearly outside the scope of the federal statute. Such areas include: use of tissue or organs for research purposes which were removed or obtained from human infants prior to death; use of tissue or organs for research purposes which were removed or obtained from human infants in utero (prior to extraction from the mother); payment or receipt of money or other valuable consideration for site fees, transportation, processing, preservation, quality control or storage of human fetal tissue derived from an induced abortion; use of tissue or organs from aborted human infants for research purposes other than for transplantation; the performance of any act or procedure in the course of an abortion, for research purposes, which increases the duration of the procedure or alters its performance, and is not intended to benefit the mother; reporting of information concerning the harvesting of fetal tissue to a designated State agency; and a ban on participation in research or experimentation using aborted children by State employees, state institutions or State funded entities or programs. A severability clause should be included as well.
 VII. Conclusion
There is no legal prohibition to banning research and experimentation using tissue or organs from human infants that are the subjects of induced abortion provided the legislation is properly drafted.
Sincerely,
 DON STENBERG Attorney General
 Steve Grasz Deputy Attorney General
Approved by:
DON STENBERG
Attorney General
cc: Clerk of the Legislature
[1] The concern expressed by one court about possibly prohibiting reproductive choice in the form of embryo transfers and fertility treatment in Lifchez v. Hartigan, 735 F. Supp. 1361
(N.D.Ill. 1990) can be easily avoided by proper drafting.
[2] Although one could argue that some limited forms of experimentation on a living fetus ex utero (after delivery) are permitted under the exceptions in the Federal guidelines, this is a highly dubious proposition. First of all, just as the intentional killing of a nonviable premature baby is prosecutable as homicide, the intentional injury or performance of an invasive procedure upon such child could be considered a criminal assault.See Neb. Rev. State. § 28-310 and 28-109(16). See Showry, v.Texas, 690 S.W.2d 689, 692 (Tex.App. 1985). Furthermore, such child is a "person" upon live birth under the Fourteenth Amendment and is entitled to its protection.
[3] Given the level of specificity in the Arizona statute, as compared to many other fetal experimentation statutes, one could view the result as a manifestation of what a majority of current U.S. Supreme Court Justices have referred to as the "abortion ad hoc nullification machine." This so-called "machine" finds ways to nullify any State attempt to regulate in any area related to abortion. The existence and operation of the abortion ad hoc nullification machine was first recognized by Justice O'Connor (joined in her dissent by then-Justice Rehnquist) in Thornburgh v.A.C.O.G., 476 U.S. 747, 814, 106 S.Ct. 2169, 2206-2207 (1986). It was more recently described by Justice Scalia (joined by Justice Kennedy and Justice Thomas in his partial concurrence and partial dissent) in Madsen v. Women's Health Center, Inc., 114 S.Ct. 2516,2534-2535 (1994). Thus, a majority of the U.S. Supreme Court has decried its existence and operation. Nonetheless, because of this problem it is all the more important to clearly define all terms in fetal experimentation statutes.
[4] For example, there would surely be a rational basis to prohibit the use of organs taken from executed prisoners in China (an alleged practice that has been reported in the media) while allowing the use of legitimately donated organs from naturally occurring deaths. In both cases the person is dead. Yet, a public policy can easily be articulated to distinguish between the two situations.
[5] A rather extensive review of several State interests which are present even with respect to an unborn child that is about to be, or is in the process of being, killed was set forth by Seventh Circuit Court of Appeals Judge Manion in Doyle.