**Aaron LIFCHEZ, et al., Plaintiffs,**

v.

**Neil F. HARTIGAN and Richard M. Daley, Defendants.**

**No. 82 C 4324.**

United States District Court, N.D. Illinois, E.D.

April 26, 1990.

---

9. Indeed, the outcome in *Jabbar* rested in part on the court's interpretation of the "shall" language in § 405(c)(4)(C).

Colleen K. Connell, The Roger Baldwin Foundation of ACLU, Lori B. Andrews, Ami Jaeger, American Bar Foundation, Frances Krasnow, Neal, Gerber & Eisenberg, Chicago, Ill., for plaintiffs.

Harry McKee, Asst. State's Atty., Paula Giroux, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

Dr. Lifchez represents a class of plaintiff physicians who specialize in reproductive endocrinology and fertility counselling. Physicians with these medical specialities treat infertile couples who wish to conceive a child. Dr. Lifchez is suing the Illinois Attorney General and the Cook County State's Attorney, seeking a declaratory judgment that a provision of the Illinois Abortion Law is unconstitutional. He also seeks a permanent injunction against the defendants from enforcing the statute. The provision at issue concerns fetal experimentation. Ill.Rev.Stat., Ch. 38 ¶ 81–26, § 6(7) (1989). Both sides move for summary judgment, alleging that there are no disputed facts and that each side is entitled to judgment as a matter of law. The court finds that § 6(7) of the Illinois Abortion Law violates the Constitution in two ways: (1) it offends Fourteenth Amendment principles of due process by being so vague that persons such as Dr. Lifchez cannot know whether or not their medical practice may run afoul of the statute's criminal sanctions, and (2) the statute impinges upon a woman's right of privacy and reproductive freedom as established in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), and their progeny. The court therefore declares § 6(7) of the Illinois Abortion Law to be unconstitutional and permanently enjoins the defendants from enforcing it.

### *Vagueness* [1]

Section 6(7) of the Illinois Abortion Law provides as follows:

(7) No person shall sell or experiment upon a fetus produced by the fertilization of a human ovum by a human sperm unless such experimentation is therapeutic to the fetus thereby produced. Intentional violation of this section is a Class A misdemeanor. Nothing in this subsection (7) is intended to prohibit the performance of in vitro fertilization.

1. Defendant Hartigan makes a belated abstention argument in his Response Brief in Opposition to Plaintiff's Motion for Summary Judgment at 11. As Dr. Lifchez points out, this is a curious litigation strategy for a party who has himself moved for summary judgment on the exact same issues presented by Dr. Lifchez' motion. The court declines to abstain. Abstention is appropriate "where an unconstrued state statute is susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.'" *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976).

The costs of abstention in terms of delay and expense are often substantial. *Kusper v. Pontikes,* 414 U.S. 51, 54–55, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). Those costs are not justified when the challenged statute cannot reasonably be construed to avoid interfering with a woman's reproductive privacy rights under *Roe v. Wade* and *Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 441–42, 103 S.Ct. 2481, 2498–99, 76 L.Ed.2d 687 (1983). The costs of abstention are even less justified when the challenged statute is so vague that it violates Fourteenth Amendment due process. *Colautti v. Franklin,* 439 U.S. 379, 392 n. 9, 99 S.Ct. 675, 684 n. 9, 58 L.Ed.2d 596 (1979).

Ill.Rev.Stat., Ch. 38 ¶ 81–26, § 6(7) (1989). Dr. Lifchez claims that the Illinois legislature's failure to define the terms "experimentation" and "therapeutic" renders the statute vague, thus violating his due process rights under the Fourteenth Amendment. The court agrees.

■ Vague laws—especially criminal laws—violate due process in three ways. First, they fail to give adequate notice of precisely what conduct is being prohibited. Without such notice, it is impossible for people to regulate their conduct within legal bounds. *Smith v. Goguen*, 415 U.S. 566, 572 n. 8, 94 S.Ct. 1242, 1247 n. 8, 39 L.Ed.2d 605 (1974) (statute holding criminally liable anyone who "treats contemptuously" the United States flag held to be unconstitutionally vague, citing *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939): "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.") See also *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972) ("Vague laws may trap the innocent by not providing fair warning.") The second problem with vague statutes is that, by failing to explicitly define what conduct is unlawful, they invite arbitrary and discriminatory enforcement by the police, judges, and juries. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972) (Court held unconstitutionally vague a vagrancy statute outlawing "rogues ... vagabonds ... common night walkers ... persons wandering or strolling around from place to place without any lawful purpose or object, habitual loafers ..."). See also *Smith v. Goguen*, 415 U.S. at 575, 94 S.Ct. at 1248 (commenting on the lack of a clear standard in phrase "treats contemptuously" for flag statute, Court said "Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law.")

Last, vague standards of unlawful conduct, coupled with the prospect of arbitrary enforcement, will inevitably cause people to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Grayned v. Rockford*, 408 U.S. at 109, 92 S.Ct. at 2299. This is an especially dangerous consequence of vague statutes that encroach upon constitutional rights. *Colautti v. Franklin*, 439 U.S. 379, 391, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979) (held unconstitutionally vague an abortion law requiring persons performing abortions to preserve life of fetus if it could be determined that the fetus "is viable or if there is sufficient reason to believe that the fetus may be viable ..."). See also *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (although upholding drug paraphernalia ordinance against a vagueness attack, Court warned that "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."); *Smith v. Goguen*, 415 U.S. at 573, 94 S.Ct. at 1247 ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.") It is a fundamental principle of due process that persons " 'of common intelligence' not be forced to guess at the meaning of the criminal law." *Id.* at 574, 94 S.Ct. at 1248.

### A. *Experiment or Routine Test?*

■ The Illinois legislature's failure to define "experimentation" and "therapeutic" in § 6(7) means that persons of common intelligence will be forced to guess at whether or not their conduct is unlawful. As Dr. Lifchez points out in his briefs, there is no single accepted definition of "experimentation" in the scientific and medical communities. Dr. Lifchez identifies four referents for the term. One

meaning of experiment is pure research, where there is no direct benefit to the subject being experimented on, and the only goal of the research is to increase the researcher's knowledge. Plaintiff's Brief in Support of Summary Judgment at 7. This definition describes the defendants' "Orwellian nightmare" of laying out fetuses in a laboratory and exposing them to various harmful agents "just for the scientific thrill" of it. Defendant Hartigan's Reply Brief in Support of Summary Judgment at 3. A second meaning of experiment includes any procedure that has not yet been sufficiently tested so that the outcome is predictable, or a procedure that departs from present-day practice. This is the kind of definition adhered to by insurance companies, which often deny coverage for procedures whose effectiveness is not generally recognized. Plaintiff's Brief in Support of Summary Judgment at 8. Dr. Lifchez also cites to the definition of experiment by the American Fertility Society, which includes as "experimental" even standard techniques when those techniques are performed by a practitioner or clinic for the first time. *Id.* at 8–9. Finally, any medical therapy where the practitioner applies what he learns from one patient to another, could be described as an "experiment." *Id.* at 9. See, e.g., *Margaret S. v. Edwards*, 794 F.2d 994, 999 (5th Cir.1986) (medical treatment can be described as both a test and an experiment "whenever the results of the treatment are observed, recorded, and introduced into the data base that one or more physicians use in seeking better therapeutic methods.") This definition of experiment is in line with that apparently contemplated by the federal regulations on protection of human research subjects: " 'Research' means a systematic investigation designed to develop or contribute to generalizable knowledge." 45 C.F.R. § 46.102(e) (1989).

The legislative history of § 6(7) is unenlightening as far as nailing down a particularized meaning of "experiment" to counter the vagueness that Dr. Lifchez claims is inherent in the statutory language. The bill's sponsor, Representative O'Connell, responded as follows to the governor's veto of the bill (due to what the governor saw as unconstitutional vagueness in the word "experimentation"): "I would submit that the word experiment is quite clear and does not have a vague connotation to it. In fact, the American Heritage dictionary is quite clear in defining experiments as a test made to demonstrate a known truth; to examine the validity of a hypothesis or to determine the efficacy of something previously untried." Plaintiff's Response to Motion for Summary Judgment, Exhibit A, State of Illinois 84th General Assembly, House of Representatives Debate, October 30, 1985 (Exhibit A), p. 74. It is hard to imagine two more opposed definitions of "experiment" than, on the one hand, "a test made to demonstrate a known truth," and, on the other hand, a test "to determine the efficacy of something previously untried." That the bill's sponsor could offer such wildly different definitions of "experiment" as if they both meant the same thing offers little help to persons of common intelligence who want to know what the state forbids.[2] *Smith v. Goguen*, 415 U.S. at 574, 94 S.Ct. at 1247; *Lanzetta v. New Jersey*, 306 U.S. at 453, 59 S.Ct. at 619.

It is difficult to know where along this broad spectrum of possible meanings for "experiment" to fit the medical procedures performed by Dr. Lifchez and his colleagues. These procedures can be roughly divided into three kinds: diagnostic, *in vitro* fertilization and related technologies, and procedures performed exclusively for the benefit of the pregnant woman. The

**2.** Defendant Daley claims that "experiment" and "therapeutic" have common definitions which, for some reason he does not explain, keep § 6(7) from being too vague. Defendant Daley's Brief in Support of Summary Judgment at 3. But the problem of vagueness here derives not so much from lack of a common definition of "experiment" as from the fact that there are

several "common definitions," some of which oppose each other. A "test" to demonstrate something already known and a "test" to determine something as yet untried are very different kinds of tests. Vagueness can arise as much from coupling a concept with its antithesis as from a single, imprecise definition.

statute's vagueness affects all three kinds of procedures, but in different ways.

### Diagnostic Procedures

One of the more common procedures performed by reproductive endocrinologists is amniocentesis. Amniocentesis involves withdrawing a portion of the amniotic fluid in order to test it for genetic anomalies. It is performed on women considered to be at risk for bearing children with serious defects. Plaintiff's Brief in Support of Summary Judgment at 15 n. 16. The purpose of the procedure is to provide information about the developing fetus; this information is often used by women in deciding whether or not to have an abortion. Although now routinely performed, amniocentesis could be considered experimental under at least two of Dr. Lifchez' definitions: it could be classified as pure research, since there is no benefit to the fetus, the subject being "experimented" on; it could also be experimental (as defined by the American Fertility Society) if the particular practitioner or clinic were doing it for the first time.

Amniocentesis illustrates well the problem of deciding at what point a procedure graduates from "experimental" to routine. Does this occur the fifth time a procedure is performed? the fiftieth? the five hundredth? the five thousandth? Shortly before the Illinois Abortion Law was first passed in 1975, amniocentesis was considered an experimental procedure by most definitions of the term. Plaintiff's Brief in Support of Summary Judgment at 16 n. 16. See *National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, Research on the Fetus; Appendix,* "An Assessment of the Role of Research Involving Living Human Fetuses in Advances in Medical Science and Technology" at 15–25 through 15–45. And yet ten years later, the legislature engaged in the following colloquy:

> Didrickson: Okay then, according to this information sheet that I have in front of me, what may be affected in addition to that rubella vaccination on the aborted fetus situation would be the 'corrian' biopsy which replaces potentially amniocentesis in the future?
>
> O'Connell: This is in no way to affect amniocentesis or that process.
>
> Didrickson: So, that's a third category it would not affect?
>
> O'Connell: Well, that presupposes that amniocentesis is an experimentation on a fetus.
>
> Didrickson: And you are saying that amniocentesis in, vitro fertilization ... preservation would not be affected by your Bill?
>
> O'Connell: That's correct.

Exhibit A, p. 120. Although the non-experimental status of amniocentesis in 1985 may be established through this reference to legislative intent, the above dialogue underscores the problem of refusing to define the key terms in § 6(7) in the context of the rapidly growing field of reproductive endocrinology. Dr. Lifchez can hardly be expected to know which of his medical activities would be illegal now if he were to look back on the quick evolution of amniocentesis from (very likely) illegal experiment in 1975 to explicitly endorsed "process" in 1985. Statutory language that embraces both of these possibilities simply "has no core" of meaning and forces people of common intelligence to guess at what the law forbids. *Smith v. Goguen,* 415 U.S. at 574, 578, 94 S.Ct. at 1247, 1249. For this reason, it is unconstitutionally vague.

■ The court is keenly aware that, because of the meteoric growth in reproductive endocrinology, any classification of a particular procedure as either "experimental" or "routine" could easily be out-of-date within six months. The same can be said for any statistics which might support a particular classification: they could be downright quaint upon publication of the next study. The court's rationale does not depend on an accurate scientific classification of amniocentesis or any other technique. If amniocentesis is no longer "experimental," then some variation of it (or some other procedure) will be. Whether or not any particular procedure is experimental or routine is not as important as the fact that many procedures begin as the

former and become the latter. It is this *process* that counts, not the classification at any particular point in time.

For this reason, the court has not ventured very far from the parties' briefs, but has relied instead on their undisputed descriptions of different procedures and also on the medical authorities that are cited in support of those descriptions. That the technology in the field may outstrip the parties' briefs—and this court's opinion—does not change the fundamental progression from "experiment" to "routine" in much scientific endeavor. It also does not relieve lawmakers of the responsibility for recognizing the inevitability of this progression, and particularly describing those actions that are unlawful. Failure to do so results in the anomalous situation of amniocentesis. The very same procedure that is explicitly endorsed today would have been illegal ten years earlier—the illegality resulting from a legislative insistence on using a protean term such as "experiment." A statute is unconstitutionally vague if the mere passage of time can transform conduct from being unlawful to lawful.

The development of chorionic villi sampling further illustrates this problem. Chorionic villi sampling involves inserting a catheter through the cervix in order to take a biopsy of the chorionic tissue, tissue surrounding the fetus. As with amniocentesis, it is a diagnostic procedure designed to give information about the developing fetus; this information is often used by a pregnant woman in deciding whether or not to have an abortion. Chorionic villi sampling differs from amniocentesis in that it yields different genetic information, it can be performed earlier in the pregnancy, and, at least at present, it is riskier to the fetus. There is also little dispute that it is experimental. Plaintiff's Brief in Support of Summary Judgment at 16. Considering all this, and especially given that chorionic villi sampling would only rarely be therapeutic to the fetus (if, for example it led to *in utero* surgery), it is surprising to see Representative O'Connell, in the passage quoted above, apparently exempting this procedure from the reach of § 6(7): "Di-

drickson: ... according to this information sheet ... what may be affected would be the 'corrian' biopsy which replaces potentially amniocentesis in the future? O'Connell: This is in no way to affect amniocentesis or that process." This response is both surprising and confusing, since the language of the statute, as well as either of Representative O'Connell's own definitions of experiment ("to examine the validity of a hypothesis or to determine the efficacy of something previously untried") can quite easily include chorionic villi sampling, at least at its present stage of development. Once again, even if he were to study the statute and read the legislative debates, Dr. Lifchez could not know with any certainty what conduct is being forbidden.

### In Vitro Fertilization and Related Technologies

Many other procedures that Dr. Lifchez performs on his patients could fall within the ambit of § 6(7). Among these are *in vitro* fertilization and the many techniques spawned through research into *in vitro* fertilization. The difficulty posed by these procedures is not just whether or not they are "experimental," but whether they are "therapeutic to the fetus." The statute's failure to define this phrase contributes to its vagueness. *In vitro* fertilization itself involves removal of a mature ovum, placing it in a petri dish or test tube (in glass, that is, *in vitro*), fertilizing it, and returning the embryo to the woman's uterus where it matures into a fetus. *In vitro* fertilization itself is explicitly permitted by the statute. Related reproductive technologies are less certain. Embryo transfer, for example, involves removal of an embryo from one woman's uterus and placing it in the uterus of a second woman. The variations on this basic technique are considerable. A donated egg could be fertilized *in vitro* (with a partner's or a donor's sperm), be placed in a second woman's uterus to gestate for five days, and then be flushed out for implantation in the woman trying to get pregnant. Lori B. Andrews, *Medical Genetics: A Legal Frontier* at 89–90 (American Bar Foundation 1987) That this procedure is experimental is undisputed.

Whether it is "therapeutic to the fetus" (actually, embryo, but legislators and courts commonly—and incorrectly—elide the two) is more complicated. Certainly, it can be argued that it is not therapeutic. Removing an embryo from one woman's uterus, where it is gestating, for implantation in another woman, may be therapeutic for the woman trying to get pregnant, but it is not necessarily therapeutic for that embryo.

Perhaps this particular technique is protected by § 6(7)'s exception for *in vitro* fertilization. ("Nothing in this subsection (7) is intended to prohibit the performance of in vitro fertilization.") But consider a slight variation on the procedure, where fertilization occurs *in vivo*, that is, in the uterus of the second woman. See Andrews, *Medical Genetics* at 163. There is ample evidence in the legislative debates that the legislature did not intend to prohibit technologies that might result in the birth of healthy children: "The in vitro fertilization process will improve but it will still remain in vitro fertilization and it is not this intent ... the intent of this Bill to, in any way, diminish that very valuable medical wonder ... We're not trying to, in any way, jeopardize the legitimate purposes of in vitro fertilization or amniocentesis or anything designed to enhance the birth of children by parents who otherwise could not have had those children." Exhibit A, pp. 83, 123. However, *in vivo* fertilization is not the same as *in vitro* fertilization, and the legislature chose to exempt only the latter from its ban on experimental procedures on the embryo.

It is of course a long-established rule of statutory construction that "the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *Matter of Cash Currency Exchange, Inc.*, 762 F.2d 542, 552 (7th Cir. 1985). This is part of the answer to Defendant Hartigan's claim that by not defining the key terms in § 6(7), the legislature allowed for "flexibility" in a growing field, rather than having a laundry list of exceptions that would be bound to omit something. The rest of the answer to this claim

is that "flexibility" is always the defense for a statutory scheme that permits arbitrary and discriminatory enforcement of the law. *Papachristou v. City of Jacksonville*, 405 U.S. at 170–71, 92 S.Ct. at 847–48. This does not change the principle that "statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law." *Smith v. Goguen*, 415 U.S. at 575, 94 S.Ct. at 1248. Since *in vivo* fertilization and other non-*in vitro* variations on embryo transfer are not explicitly exempted by § 6(7), they are subject to the same objection mentioned above: they are therapeutic for the woman trying to get pregnant and unnecessarily risky for the developing embryo.

Other procedures give rise to this and similar objections. In genetic screening of *in vitro* embryos, one cell of an eight-cell embryo is removed for testing, while the rest are frozen. If the genetic screening on the single cell is negative, the remaining seven cells can be gestated to produce a child. Andrews, *Medical Genetics* at 87. This experimental procedure is undisputedly non-therapeutic to the embryo, and although it could fall within the statute's *in vitro* exception, that exception speaks to fertilization, not genetic testing. A failed implantation following *in vitro* fertilization genetic screening could subject Dr. Lifchez to criminal liability.

Two other *in vitro* fertilization-related procedures have a similarly uncertain status. Super-ovulation involves administering various hormones to induce ovulation, resulting in multiple ova. However, the hormones that are used for super-ovulation may have two negative effects on a woman's ability to get pregnant: lower-quality ova are produced and the uterus becomes less receptive to the embryo being implanted. In order to improve the chances of super-ovulation resulting in a pregnancy, Dr. Lifchez may need to experiment with particular elements in the procedure to achieve a more receptive uterine lining or better quality embryos. Plaintiff's Brief in

Support of Summary Judgment at 25–27. Not all such attempts will be successful, and any particular one might not be therapeutic to the embryos, thus violating § 6(7).

A similar problem faces Dr. Lifchez even in performing *in vitro* fertilization itself. While the statute permits "the performance of in vitro fertilization," experiments designed to improve that technique have a far less certain status. Dr. Lifchez identifies two elements of *in vitro* fertilization that might profitably be varied in order to improve the rate of success: the shape of the vessel in which *in vitro* fertilization occurs, and the growth media in which the ova are fertilized. Trying different combinations of these two elements are bound to result in some failures, and hence not be therapeutic to those particular embryos. While defendants argue that it is obvious that an attempt to improve *in vitro* fertilization is protected, even if that attempt fails, this is apparently not the understanding of the bill's sponsor:

Greiman: Mr. O'Connell, the Bill, I understand as it ... as it was amended, says that it is not intended to prohibit in vitro research. Is that correct? Not intended to prohibit in vitro research.

O'Connell: That Amendment was in the Senate, yes.

Greiman: It's not intended to. Now, does that mean that it might as it's drawn?

O'Connell: No, it shouldn't. It does not. We're trying to make the legislative intent in the language of the legislation to be as clear as possible that it shall not prohibit in vitro fertilization.

Greiman: So, that research on in vitro fertilization and techniques of in vitro fertilization techniques.

O'Connell: *I didn't say research or techniques.* In vitro ...

Greiman: Well, what does it mean then, if it means anything?

O'Connell: *The actual in vitro fertilization is not prohibited under this measure.*

Exhibit A, pp. 117–118 (emphasis added). In this equivocal exchange, the bill's spon-

sor says first that further research is permitted ("Greiman: ... it is not intended to prohibit in vitro research. Is that correct? O'Connell: ... yes."), but then changes, implying that only *in vitro* fertilization as it is presently performed is permitted ("Greiman: So, that research on in vitro fertilization and techniques of in vitro fertilization ... O'Connell: I didn't say research or techniques ... The actual in vitro fertilization is not prohibited under this measure.") The only certainty that Dr. Lifchez could take from this evidence of legislative intent is that he can attempt to improve "the actual in vitro fertilization" at his peril.

*Procedures for the Pregnant Woman*

A third class of procedures that Dr. Lifchez performs for his patients are those that are exclusively for the benefit of the pregnant woman. In order to discover correal carcinoma, for example, Dr. Lifchez would need to take a sample of fetal tissue for testing. Correal carcinoma originates with the fetus and is capable of killing pregnant women. Any experimental therapy designed to detect or treat this condition is necessarily a non-therapeutic experiment upon the fetus. See *Margaret S. v. Edwards,* 794 F.2d 994, 999 n. 12 (5th Cir. 1986); Plaintiff's Brief in Support of Summary Judgment at 11–13; Frederikson Affidavit ¶ 7.

Additional problems could arise with any therapy designed to help a pregnant woman. "With rare exception, any drug that exerts a systemic effect in the mother will cross the placenta to reach the embryo and fetus." Jack A. Pritchard, et al., *Williams Obstetrics* at 260 (17th ed. 1985). See also *The Merck Manual* at 1752–55 (15th ed. 1987). Thus, treatment for virtually any maternal complaint, whether it be high blood pressure, diabetes, epilepsy, or headaches, has the potential to affect the fetus. Even the use of aspirin and acetaminophen has an unknown, and potentially harmful, impact on fetal development. Quite naturally, a physician will want to know as much as possible about the effects of medication to both the pregnant woman, whose condition he is treating, and to her fetus.

Such knowledge is often shrouded in uncertainty:

> The effects on the offspring cannot be predicted accurately either from the effects of lack of effects on the mother or from the effects or lack of effects on the offspring of animal species. Widespread use of a medication during pregnancy without recognized adverse effects on the fetus does not guarantee the safety of the medication. Only after many years of use was it established that diphenylhydantoin (Dilantin) and phenobarbital given to women to control epilepsy may both induce fetal malformation and impair synthesis by the fetus and newborn infant of the vitamin K-dependent coagulation factors II, VII, IX, and X. Not until deliberate, careful, extensive monitoring has failed to identify any adverse effects on the offspring not only in utero or childhood but also in the mature adult, can a drug really be declared to be safe for use in pregnancy. An especially pertinent example of delayed recognition of adverse effects by a drug that was widely used in obstetrics for a number of years is the induction of several abnormalities of the reproductive organs, including vaginal cancer, in young women whose mothers ingested diethylstilbestrol during pregnancy.

*Williams Obstetrics* at 260.

What happens when a physician wishes to try a new therapy on his pregnant patient which may have an unknown effect upon the fetus? What happens when he is virtually certain of a deleterious effect upon the fetus? See, e.g., Frederikson Affidavit ¶ 7; *Merck Manual* at 1752–53. Such a procedure could certainly be classified as "experimental" as to the fetus. And to the extent the physician chooses to treat primarily, or exclusively, his pregnant patient, it is doubtful that such treatment could be called "therapeutic to the fetus." By not adequately defining the terms "experiment" and "therapeutic", § 6(7) not only makes it difficult to know what conduct is forbidden, it also creates a situation where the pregnant woman and her fetus are in competition for the physician's therapy.[3]

### Margaret S. Cases

The defendants point to *Margaret S. v. Edwards*, 488 F.Supp. 181 (E.D.La.1980) (*Margaret S. I*), to support their claim that the Illinois statute's failure to define "experimentation" does not render § 6(7) unconstitutionally vague. The Louisiana statute at issue in *Margaret S. I* provided: "No person shall experiment upon or sell a live child or unborn child unless such experimentation is therapeutic to the child or unborn child." *Id.* at 219. The *Margaret S. I* court rejected a claim that the statute was unconstitutionally vague. The court applied dictionary definitions of "therapeutic" ("of or relating to the treatment of disease or disorders by remedial agents") and "remedial" ("intended for a remedy or for the removal or abatement of a disease or of an evil") to arrive at a conclusion that the Louisiana legislature could not have meant to punish practitioners for unsuccessful experiments: "Since experimentation itself involves the chance of failure, the legislature could not have meant that only *successful* experimentation would be therapeutic or it would have said so." *Id.* at 219. The legislature must have only meant to forbid procedures not intended to benefit the fetus: "Regardless of whether he can calculate the odds of success, a doctor knows whether an experiment is intended to help a patient. If it is so intended, then it is therapeutic." *Id.* at 219–20.

---

**3.** Competition between the pregnant woman and her fetus has become an important focus of state statutes regulating abortion and of Supreme Court cases striking down such statutes. See, e.g., *Thornburgh v. American College of Obstetricians,* 476 U.S. 747, 768–71, 106 S.Ct. 2169, 2182–84, 90 L.Ed.2d 779 (1986); *Colautti v. Franklin,* 439 U.S. 379, 397–401, 99 S.Ct. 675, 686–89, 58 L.Ed.2d 596 (1979). Recently, this competition has surfaced in the context of fetal protection laws in the workplace. See, e.g., *International Union v. Johnson Controls,* 886 F.2d 871, 908–921 (7th Cir.1989) (en banc) (Easterbrook, J., dissenting), *cert. granted* —— U.S. ——, 110 S.Ct. 1522, 108 L.Ed.2d 762 (1990). See also Mary E. Becker, "From *Muller v. Oregon* to Fetal Vulnerability Policies," 53 *U.Chi.L. Rev.* 1219 (1986).

The *Margaret S. I* court then went on to claim that the statute was no impediment to doctors performing procedures such as amniocentesis, since amniocentesis, although not therapeutic to the fetus, was not an "experiment" but a "test". The court took its definition of "test" from the dictionary ("an act or process that reveals inherent qualities") and also its definition of "experiment" ("a tentative procedure ... adopted in uncertainty as to whether it will answer the desired purpose or bring about the desired result.") *Id.* at 221. The court concluded that "Doctors do not experiment upon people when they conduct such routine tests." *Id.*

This court finds the reasoning in *Margaret S. I* unpersuasive. *Margaret S. I* attempts to draw a distinction between "experiment" and "test" which simply does not exist. The dictionary definitions used by the court could easily be exchanged, since an experiment could be described as "an act or process that reveals inherent qualities" and a test is sometimes "a tentative procedure ... adopted in uncertainty as to whether it will answer the desired purpose...." [4] The key distinction, as the *Margaret S. I* court seems to implicitly recognize, lies in the certainty and predictability of the procedure ("Doctors do not experiment upon people when they conduct such *routine* tests." *Id.* (emphasis added)). And if certainty or predictability are the keys, a test is as likely to be uncertain as an experiment. For example, amniocentesis, which is now routinely performed, could have been described as "a tentative

procedure" ten to fifteen years ago. Chorionic villi sampling, far less frequently performed, while it "reveals inherent qualities," is still regarded by most as "a tentative procedure." Even *in vitro* fertilization, although explicitly permitted by the statute, would be hard-pressed to pass muster as a "test" rather than an "experiment" under the *Margaret S. I* definitions: with a 12–20% success rate ("In Vitro Fertilization–Embryo Transfer in the United States: 1988 Results from the IVF–ET Registry," 53 *Sterility* 13 (January 1990)), *in vitro* could be accurately described as "a tentative procedure ... adopted in uncertainty as to whether it will answer the desired purpose."

It was because of this inability to draw meaningful distinctions between "testing" and "experimentation" that the Fifth Circuit struck down a revised version of Louisiana's fetal experimentation law. *Margaret S. v. Edwards*, 794 F.2d 994 (5th Cir. 1986) (*Margaret S. III*).[5] (The court notes that, although the *Margaret S. III* court was construing a different statute from the *Margaret S. I* court, the issue of vagueness in the failure to define "experimentation" was precisely the same for both.)[6] The Fifth Circuit found

> that physicians do not and cannot distinguish clearly between medical experiments and medical tests. As the expert witness pointed out, every medical test that is now "standard" began as an "experiment" that became standard through a gradual process of observing the results, confirming the benefits, and often

**4.** The Oxford English Dictionary also does not draw the kind of clear distinctions between these terms that the *Margaret S. I* court sees. Its use of the word "test" to define "experiment" suggests part of the problem. The OED defines "experiment" as, variously, "The action of trying anything, or putting it to proof; a test, trial ... An expedient or remedy to be tried.... A tentative procedure; a method, system of things, or course of action, adopted in uncertainty whether it will answer the purpose.... An action or operation undertaken in order to discover something unknown, to test a hypothesis, or establish or illustrate some known truth." The word "test" is variously defined as: "That by which the existence, quality, or genuineness of anything is or may be determined ... the testing ... or trial of the quality of anything; examina-

tion, trial, proof.... The action or process of examining a substance under known conditions in order to determine its identity or that of one of its constituents."

**5.** It is not necessary to discuss *Margaret S. II*, reported as *Margaret S. v. Treen*, 597 F.Supp. 636 (E.D.La.1984), since *Margaret S. III* supersedes it.

**6.** The revised Louisiana statute provided: "No person shall experiment on an unborn child or a child born as the result of an abortion, whether the unborn child or child is alive or dead, unless the experimentation is therapeutic to the unborn child or child." *Margaret S. v. Edwards*, 794 F.2d at 998.

modifying the technique ... at one end [are] things that are obviously standard tests and [at] the other end things that are complete experimentation. But in the center there is a very broad area where diagnostic procedures of testing types overlap with experimentation procedures ... even medical *treatment* can be reasonably described as both a test and an experiment. This must be true whenever the results of the treatment are observed, recorded, and introduced into the data base that one or more physicians use in seeking better therapeutic methods. The whole distinction between experimentation and testing, or between research and practice, is therefore almost meaningless in the medical context.

*Id.* at 999.

The Illinois statute suffers from the same problems of vagueness as the Louisiana law. The legislature's failure to define "experiment" and "therapeutic" means that physicians cannot be sure whether certain procedures—such as chorionic villi sampling or embryo transfer—are illegal. Such an uncertainty is inevitable when, on the one hand, the status of many current technologies cannot be classified as "routine," and on the other hand, procedures that could be classified as routine would have been illegal ten years earlier because they were more tentative and uncertain than today and therefore, under the reasoning of *Margaret S. I,* experimental. It is of course possible that the legislature really did mean to freeze medical advances in this nascent field at their present stage. What is medically myopic is not necessarily unconstitutional. A court should be hesitant to find such a legislative intent, however, when it places physicians such as Dr. Lifchez in the bizarre position of knowing that "experimentation" in amniocentesis made it legal, while "experimentation" in chorionic villi sampling may always be illegal. The fact that many current procedures fall within the twilight zone between experiment and test, coupled with a lack of consensus as to how these terms should be defined in the first place, leaves it hopelessly uncertain as to which procedures are allowed and which are forbidden.

## B. *Therapeutic Intent*

▮▮▮ The defendants claim that the scienter requirement in § 6(7), "Intentional violation of this section is a Class A misdemeanor", saves it from being unconstitutionally vague. It is true that a scienter requirement can do this for a statute. *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) ("the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.") See also *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979) ("Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*") However, a scienter requirement cannot save a statute such as § 6(7) that has no core of meaning to begin with. See *Colautti* at 395 n. 13, 99 S.Ct. at 685 n. 13 ("The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain," quoting *Screws v. United States,* 325 U.S. 91, 101–102, 65 S.Ct. 1031, 1035–36, 89 L.Ed. 1495 (1945) (plurality opinion)). See also Note, "The Void-for-Vagueness Doctrine in the Supreme Court," 109 *U.Pa.L.Rev.* 67, 87 n. 98 (1960):

Yet it is evident that, unless the Court has been fooling itself in these cases [where a scienter requirement mitigated a law's vagueness], the 'scienter' meant must be some other kind of scienter than that traditionally known to the common law—the knowing performance of an act with intent to bring about that thing, whatever it is, which the statute proscribes, knowledge of the fact that it is so proscribed being immaterial ... Such scienter would clarify nothing; a clarificatory 'scienter' must envisage not only a knowing what is done but a knowing that what is done is unlawful or, at least, so 'wrong' that it is probably unlawful.

The intent requirement applies differently to each of the three kinds of procedures that fall within the ambit of § 6(7). As already discussed in connection with the *Margaret S.* cases, the legality of diagnostic or screening procedures such as amniocentesis and chorionic villi sampling will depend on whether they are "tests" or "experiments." If a practitioner is unable to tell whether a procedure he is about to perform is an experiment or a test, grafting on a requirement that he intend it to be one or the other does not mitigate the vagueness of what is being forbidden. In other words, while the physician may take comfort in the fact that he is administering a test in good faith, he still does not know which tests are tests and which are experiments. To the extent that amniocentesis and chorionic villi sampling (or attempts to improve them) may be experimental, they are almost certainly illegal under § 6(7). They are designed to give information about fetal development, and often aid women in making a decision about whether or not to have an abortion. Considering in addition the risk factor of spontaneous abortion from these procedures, they can hardly be called therapeutic to the fetus, no matter the practitioner's intent.

The intent requirement is more complicated with regard to the second class of procedures that Dr. Lifchez performs, procedures such as *in vitro* fertilization which are designed to produce an embryo. Dr. Lifchez argues that § 6(7) requires his experiments to be successful. Unless a procedure "is therapeutic to the fetus," he fears, he will be criminally liable. The defendants argue that the only thing inhibiting Dr. Lifchez in his efforts to improve *in vitro* fertilization through experimentation is his own unreasonable interpretation of § 6(7): as long as a practitioner intends his procedure to help the fetus, § 6(7) is no bar. There is support for the defendants' interpretation in the legislative debates:

> Dunn: If a fertilized egg is implanted in the womb of a woman and dies, is that process therapeutic to that particular fertilized egg?
>
> O'Connell: No.

> Dunn: Now, is the general process that I am talking about here …
>
> O'Connell: Excuse me, Representative Dunn.
>
> Dunn: Yes.
>
> O'Connell: The question that you proffered was that if the fertilization, the implantation fails, is that therapeutic to the fertilized egg?
>
> Dunn: Yes.
>
> O'Connell: Well, the best answer to that is that this is not a prohibition on therapeutic…. This is not a prohibition on in vitro fertilization. It is not a prohibition on therapeutic treatment for the benefit of the fetus.

Exhibit A, pp. 75–76. Up to this point, it would appear that merely the intent to produce a fertilized egg is enough to avoid § 6(7)'s criminal sanctions.

However, later in the debate, it is less certain that this is the case. As the Representatives discussed various medical techniques that § 6(7) might affect, it becomes clear that anything other than *in vitro* fertilization has a most uncertain legal status:

> O'Connell: Well, the intent is for in vitro fertilization to be permitted within the confines of this law. If it is an experimentation without the intent to result in in vitro fertilization, it would be prohibited under this law.

Exhibit A, p. 78. This statement leaves procedures such as embryo transfer and *in vivo* fertilization in a kind of legal limbo. *In vivo* fertilization involves fertilizing an ovum in a second woman's uterus through artificial insemination, and then flushing the embryo for implantation in the woman trying to get pregnant. In a broad sense, it could be argued that such an experimental procedure is intended to be therapeutic to the embryo. However, it is equally plausible to interpret the removal of a gestating embryo from one uterus to another, exposing it to the considerable risk associated with embryo transfer ("In Vitro Fertilization—Embryo Transfer in the United States: 1988 Results from the IVF–ET Registry," 53 *Sterility* 13 (January 1990); Maria Bustillo et al., "Infertile Women:

Preliminary Experience," 251 *Journal of the American Medical Association* 1171 (1984)), as evidence of therapeutic intent directed only toward the woman who wishes to bear her own child. A therapeutic intent (or at least the most therapeutic intent) toward the embryo would leave it alone to develop in the uterus in which it was fertilized.

While the defendants argue in their briefs for the broadest possible meaning of "intent" that a procedure be therapeutic to the fetus, the legislative debates suggest a far less liberal interpretation:

> O'Connell: ... We're trying to make the legislative intent in the language of the legislation to be as clear as possible that it shall not prohibit in vitro fertilization.
>
> Greiman: So, that research on in vitro fertilization and techniques of in vitro fertilization techniques.
>
> O'Connell: I didn't say research or techniques. In vitro....
>
> Greiman: Well, what does it mean then, if it means anything?
>
> O'Connell: The actual in vitro fertilization is not prohibited under this measure.

Exhibit A, pp. 117–118. While this passage does not constitute a complete exegesis of therapeutic intent, a practitioner looking for clues as to what the legislature meant could reasonably conclude that § 6(7)'s sponsor understood his bill to permit only *in vitro* fertilization as it was then practiced, not further research on *in vitro* fertilization, not refining the techniques relating to *in vitro* fertilization, and certainly not an experimental procedure such as *in vivo* fertilization.

There is an additional inconsistency between the position taken by defendants in their briefs and the apparent intent of the legislature. At several points, defendants press a purely subjective meaning of therapeutic intent: "Therefore, if a doctor is performing an 'experiment' that is *intended* to help the fetus, then that action is not criminal, no matter what the final outcome of the experiment might be." Defendant Daley's Brief in Support of Summary Judgment at 4. See also Defendant Hartigan's Reply Brief in Support of Summary Judgment at 2: "But where a person's intent is ultimately to benefit the fetus, no violation of Section 6(7) has occurred." Under such a liberal description of therapeutic intent, it is difficult to imagine an experiment that a researcher could not plausibly claim was intended to ultimately benefit the fetus. Even the "Orwellian nightmare" of injecting a fetus with, say, a rubella vaccine (Exhibit A, p. 116), either not knowing the effect of such an experiment or even strongly suspecting that it might be harmful, could be justified as a subjective hope to inoculate the fetus (maybe this time, with this dosage, it would work). Under defendants' subjective standard of therapeutic intent, only the most malevolently conceived experiments, such as injecting the fetus with a known harmful agent with the intent to kill it, would be forbidden. Such a subjective standard of criminal intent would be, to say the least, novel in the criminal law. See Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* §§ 3.5 and 3.7(f) (West 2d ed.1986). And yet this cannot be all that § 6(7) proscribes; that much is clear from the legislative debates:

> O'Connell: There has been testimony presented during the course of this Bill being considered by the General Assembly that, in fact, wholesale experimentation of fetuses has occurred in other states ... All we're trying to address is a legitimate, realistic attempt to avoid the damaging non-life considering fetal experimentation....

Exhibit A, p. 83.

> O'Connell: I was advised that there was study or experimentation in New Jersey. There was also a study cited in the New England Journal of Medicine in which 35 pregnant women were injected with a live rubella vaccine virus to determine the effects of the virus on aborted fetuses. As for this state, I do not know of any experimentation that is going on at present, but the legislation is designed prospectively to prohibit any potential experimentation.

Exhibit A, p. 116.

> Greiman: What is research? You stick your thumb in your navel and think

about it. I mean, don't you have to do things to research or no? What do you do?

O'Connell: Well, you don't have to take a live fetus and inject it with some substance to determine whether or not that substance will, in fact, result in a death or disfigurement or some damage to that fetus.

Exhibit A, p. 118.

O'Connell: ... The Bill is addressed to situations where a quantity of fetuses are laid out on a counter, for example, and injected with some kind of vaccine without any care as to what the well being of that fetus is, just to observe the affects that a certain vaccine might have. These may have been purchased by a medical facility. They may have been donated by a medical facility but ... and nevertheless, they are live fetuses that many of us in this chamber consider to be human beings. There has been suggestions that since nothing has happened in Illinois that we know of, that we shouldn't support this Bill. I would submit that we know enough in other parts of the country, other efforts to, under the name of experimentation, take wholesale liberties with fetuses under the guise of experimentation.

Exhibit A, pp. 122–23. Focusing on therapeutic intent does little to mitigate the inherent vagueness of § 6(7) as it applies to *in vitro* fertilization and related procedures.

The intent requirement is also of little help in clarifying the legality of procedures which Dr. Lifchez may perform on a pregnant woman that have an unknown effect on the fetus, procedures such as testing for correal carcinoma. This issue of transferred intent was addressed by the bill's sponsor:

The last point that the Governor makes in his veto message is that experimentation on a mother could result in an effect

... an indirect effect on the fetus and, therefore, result in preventing a woman, for example, as he points out in his message, suffering from cancer from being given certain medical treatments. I would submit that that is a misplaced concern. The Bill is quite specific in that we are addressing experimentation directly on the fetus. And the intent is on the fetus and not on the mother so that there cannot be, in effect, a transferred intent, if the experimentation is to be on the mother, the result to experimentation on the fetus.

Exhibit A, p. 74. The legislators may not have intended that there be a difficulty with "transferred intent", but they did not choose language to avoid this problem. Certainly, a pregnant woman can consent to any procedure she likes, including an experimental one. However, because of the inextricable link between her and her fetus, and because many substances will cross the placenta when administered to the woman, the "intent" to experiment on the woman could be easily interpreted as an "intent" to experiment upon the fetus. Considering the unknown effects of even many common drugs upon fetal development (*Williams Obstetrics* at 260), it is natural to expect that physicians will have at least a subjective intent to discover the effect of a drug upon the fetus when that drug is given to the pregnant woman. According to the defendants, even indifference to the fetus during such a procedure could be actionable: "The conduct that is prohibited is the conduct of a person *not* trying to help the fetus by experimentation." Defendant Daley's Brief in Support of Summary Judgment at 4. See also Defendant Hartigan's Brief in Support of Summary Judgment at 9: "The statute only makes sense when it is interpreted to prohibit only experimentation not *designed to benefit* the fetus" (emphasis in original).[7]

---

**7.** It is not the province of this court to write statutes. However, the court notes that, if the Illinois legislature were to look for ways to cure the vagueness of § 6(7)—especially the provision's failure to distinguish diagnostic from other types of procedures—models do exist. See, e.g., New Mexico Stat.Ann. § 29–9A–1(D) (1985); Rhode Island Gen. Laws § 11–54–1(b) (Supp. 1989); North Dakota Cent.Code § 14–02.2–01(3) (1989); Mass.Ann.Laws ch. 112, § 12J(a) (1985).

The uncertainty that is inherent in § 6(7) derives from its failure to define the key terms "experiment" and "therapeutic". The lack of consensus as to what these words mean, coupled with the explosion of technology in the field of reproductive endocrinology, make it impossible for Dr. Lifchez to know which of the many procedures he administers may be forbidden. When there is no clear core of meaning to a statute, "intent" does not mitigate the vagueness of the language used. Because § 6(7) does not alert persons of common intelligence to what conduct is unlawful, it is unconstitutionally vague and violates the Fourteenth Amendment.

### Reproductive Privacy [8]

■■ Section 6(7) of the Illinois Abortion Law is also unconstitutional because it impermissibly restricts a woman's fundamental right of privacy, in particular, her right to make reproductive choices free of governmental interference with those choices. Various aspects of this reproductive privacy right have been articulated in a number of landmark Supreme Court cases, including *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (striking down statute which forbid use of contraceptives on grounds that statute invaded zone of privacy surrounding marriage relationship); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (striking down statute forbidding distribution of contraceptives to unmarried persons on equal protection grounds, but observing in dicta that: "If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* at 453, 92 S.Ct. at 1038); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (establishing unrestricted right to an abortion in first trimester); and *Planned Parenthood of Missouri v. Danforth*, 428

U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (striking down provisions of abortion statute requiring spousal consent and parental consent). In *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), the Court struck down a statute which forbid the sale of contraceptives to minors, forbid anyone other than pharmacists from distributing contraceptives to anyone, and forbid all advertising of contraceptives. The Court reviewed its prior privacy cases and declared that

> The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right of privacy, a right first explicitly recognized in an opinion holding unconstitutional a statute prohibiting the use of contraceptives ... and most prominently vindicated in recent years in the contexts of contraception ... and abortion.

*Id.* at 685, 97 S.Ct. at 2016 (citations omitted).

Section 6(7) intrudes upon this "cluster of constitutionally protected choices." Embryo transfer and chorionic villi sampling are illustrative. Both procedures are "experimental" by most definitions of that term. Both are performed directly, and intentionally, on the fetus. Neither procedure is necessarily therapeutic to the fetus. In embryo transfer, it is not therapeutic to remove the embryo from a woman's uterus after it has been fertilized and expose it to the high risk associated with trying to implant it in the infertile woman. In chorionic villi sampling, it is not therapeutic to the fetus to invade and snip off some of its surrounding tissue. Both embryo transfer and chorionic villi sampling violate any reasonable interpretation of § 6(7).

■■ Both procedures, however, fall within a woman's zone of privacy as recognized in *Roe v. Wade, Carey v. Population*

**8.** Although neither party has raised the issue, the court notes that Dr. Lifchez has standing to assert the reproductive privacy rights of his patients. See *Singleton v. Wulff*, 428 U.S. 106, 117–18, 96 S.Ct. 2868, 2875–76, 49 L.Ed.2d 826 (1976) and *Doe v. Bolton*, 410 U.S. 179, 188–89, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973).

*Services International,* and their progeny. See also John A. Robertson, "The Right To Procreate and In Utero Fetal Therapy," 3 *J.Leg.Med.* 333, 339 (1982). Embryo transfer is a procedure designed to enable an infertile woman to bear her own child. It takes no great leap of logic to see that within the cluster of constitutionally protected choices that includes the right to have access to contraceptives, there must be included within that cluster the right to submit to a medical procedure that may bring about, rather than prevent, pregnancy. Chorionic villi sampling is similarly protected. The cluster of constitutional choices that includes the right to abort a fetus within the first trimester must also include the right to submit to a procedure designed to give information about that fetus which can then lead to a decision to abort. Since there is no compelling state interest sufficient to prevent a woman from terminating her pregnancy during the first trimester, *Roe v. Wade,* 410 U.S. at 163, 93 S.Ct. at 731; *Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 450, 103 S.Ct. 2481, 2503, 76 L.Ed.2d 687 (1983), there can be no such interest sufficient to intrude upon these other protected activities during the first trimester. By encroaching upon this protected zone of privacy, § 6(7) is unconstitutional.

## CONCLUSION

The court grants Dr. Lifchez' motion for summary judgment and denies the defendants' motion for summary judgment. Section 6(7) of the Illinois Abortion Law is unconstitutional and the defendants are permanently enjoined from enforcing it.